ROBERT YEE AND SHIRLEY YEE, APPELLANTS, *v.* HOWARD WEISS, INDIVIDUALLY AND DOING BUSINESS AS RENO SPARKS R.V. AND AUTO CENTER, INC. AND RENO SPARKS R.V. AND AUTO SERVICE CENTER, INC., A NEVADA CORPORATION, RESPONDENTS.

No. 24340

July 7, 1994                    877 P.2d 510

*Richard G. Hill,* Reno, for Appellants.

*David C. McElhinney,* Reno, for Respondents.

## OPINION

*Per Curiam:*

This is an appeal from a decision of the district court finding constructive eviction in a commercial lease. For reasons stated below, we hold that no constructive eviction occurred in this case.

### FACTS

Appellants Robert and Shirley Yee ("the Yees") became the owners of a large parcel of commercial real estate in Reno in early 1991. Respondent Howard Weiss ("Weiss"), doing business as Reno Sparks R.V. and Auto Service Center, Inc., was a tenant of the Yees at this commercial property.

Prior to the Yees' ownership of the property, Weiss, as president of Reno Sparks R.V. and Auto Service Center, Inc., entered into a commercial lease in 1988 with the previous owner of the property, Mattingly Investments, Inc. Weiss signed the lease in his capacity as president and a second time at the bottom of the page after the handprinted word "INDIVIDUAL."

The lease, which is the subject of this appeal, encompassed 6,331 square feet of space to be used as a repair center for cars and R.V.s. The term of the lease was ten years with a rent of $3,798.60 per month with adjustments for the consumer price index. The lease provided for the "nonexclusive right to use, in common with other parties occupying the buildings or projects, the parking areas and driveways . . . subject to reasonable rules and regulations as Landlord may from time to time prescribe." At the time Weiss took possession of the premises in December 1988, the only other tenant was Gibralter Transmission.

Six months after Weiss took possession, he began to experience parking problems, making it difficult for his customers to park their R.V.s or maneuver them into the repair bays. Weiss complained to the landlord, Mattingly Investments, Inc., but the landlord did nothing to alleviate the problems. However, Weiss testified that the landlord told him that something would be done in the future if the problems continued.

The Yees became the owners of the property by way of a property exchange in February 1991. Prior to closing, an agent gave each tenant a written estoppel certificate. Paragraph six of the certificate provided that all conditions of the lease to be performed by the landlord and necessary to the enforceability of the lease had been satisfied, except as noted by the tenant. In addition, paragraph seven of the certificate stated that there were no uncured defaults by the landlord under the lease and the tenant knew of no conditions which, with notice, would constitute a default, unless otherwise noted. Weiss signed the certificate January 29, 1991. Following both paragraphs six and seven on his certificate is the typed word "none." He did not make note of the parking problems, though he testified that he verbally informed an agent representing the Yees. After the Yees took possession, Weiss informed the Yees' Reno agent, Rick LeMay ("LeMay"), that if something was not done about the parking situation, he would be forced to terminate his tenancy.

Over a year later, on April 24, 1992, Weiss sent the Yees a letter informing them that he intended to vacate the premises. Weiss gave the following reasons for terminating the lease: (1) the Yees had leased the premises to competing businesses; (2) a wall, which was not in the original plans (but which existed when he moved in), obstructed his view of his shop; and (3) parking in the complex was inadequate to the point that his business was substantially affected. After Weiss vacated the premises, the Yees filed a complaint for damages for breach of contract, unjust enrichment, fraud, and accrued rent from both before and after Weiss vacated the premises. The complaint named Weiss both

individually and in his capacity as president of Reno Sparks R.V. and Auto Service Center.

A two-day bench trial was held. Weiss testified that the parking situation had deteriorated to the point that his business was failing. However, Weiss testified that he had no business records to substantiate his claims of a substantial loss in business due to the parking problems. He also testified that prior to vacating, he had paid less rent than was due on the lease. Finally, he testified that he had not intended to become a co-tenant on the lease by signing his name a second time after the handprinted word "INDIVIDUAL."

The district court held that Weiss himself was not a co-tenant despite the fact that he had signed the lease twice, and therefore, he was not individually liable. In addition, the court concluded that the Yees' failure to remedy the parking situation constituted constructive eviction under Nevada law. The court held that Weiss had given adequate warning to the Yees; therefore, the Yees should have known of the parking problems and acted upon them. The court also held that the Yees could not rely on the estoppel certificate in light of Weiss' testimony that he had not filled out the certificate and that his signature had been obtained through misrepresentation.

We now conclude that although the district court correctly held that Weiss was not individually liable on the lease, the court erred in holding that the Yees constructively evicted Weiss and that they could not rely on the estoppel certificate signed by Weiss.

## DISCUSSION

Constructive eviction is a well-established concept in this state. We have held that constructive eviction occurs when, through the actions or inaction of the landlord, the whole or a substantial part of the premises is rendered unfit for occupancy for the purpose for which it was leased. Las Vegas Oriental v. Sabella's of Nev., 97 Nev. 311, 313, 630 P.2d 255, 256 (1981) (failure to provide adequate heating and air conditioning to restaurant and lounge area was constructive eviction when those areas were an integral portion of the business). When constructive eviction occurs, the tenant must treat the landlord's interference as an eviction and vacate the premises within a reasonable time. Portal Enterprises, Inc. v. Cahoon, 102 Nev. 107, 109, 715 P.2d 1324, 1326 (1986) (approximately three months considered reasonable). No constructive eviction results if the tenant continues in possession even though disturbed in the beneficial enjoyment of the premises. Baley & Selover v. All Amer. Van, 97 Nev. 370, 373, 632 P.2d 723, 724 (1981) (retaining premises for two years after an

inconvenient situation resulted due to other tenants' use of parking lot negated possibility of constructive eviction).

In the instant case, the district court held that constructive eviction resulted from the Yees' failure to implement regulations to maintain proper traffic flow and this failure materially interfered with Weiss' right to exercise his nonexclusive use of the parking lot. The district court based its decision on Weiss' testimony concerning the parking situation and his verbal complaints to the Yees' agent, as well as LeMay's testimony that he had observed the parking area in a crowded condition on several occasions.

We disagree that there was sufficient evidence to support the district court's conclusions. We note that Weiss provided the court with no concrete proof that his business was substantially and adversely affected by the parking situation. The only proof he provided was his own testimony. In addition, the lease provided for Weiss' *nonexclusive* use of the parking area. The lease did not specifically require the Yees to control the parking situation in order to satisfy each tenant's nonexclusive use of the parking area. We cannot conclude from the evidence that Weiss was constructively evicted from the premises simply because he found the parking situation less than convenient.

In order to show constructive eviction of a business, it is necessary to provide more persuasive evidence than simply verbal complaints. The tenant must show that the landlord's actions or inactions caused the premises to be entirely unfit for the use for which the tenant leased them. *Las Vegas Oriental,* 97 Nev. at 313, 630 P.2d at 256. We cannot conclude from the evidence presented that such was the case here. Accordingly, we hold that the district court erred in concluding that the Yees constructively evicted Weiss.

The district court also held that the Yees were not entitled to rely on the estoppel certificate signed by Weiss in light of Weiss' testimony that he had not filled out the certificate and that his signature has been obtained by misrepresentation. We disagree.

Paragraph eighteen of the lease states that a tenant will provide, at the request of the landlord, an estoppel certificate that may be relied upon by any prospective purchaser. Weiss signed the lease and is therefore bound by this provision. He did not testify that the contents of the lease were misrepresented to him. However, Weiss testified that he did not read the estoppel certificate prior to signing it. This certificate, which Weiss signed but failed to read, provided that there were no existing problems regarding the enforceability of the lease.

Courts have consistently held that one is bound by any document one signs in spite of any ignorance of the document's content, providing there has been no misrepresentation. *See, e.g.*, John Call Engineering v. Manti City Corp., 743 P.2d 1205 (Utah 1987); Skagit State Bank v. Rasmussen, 745 P.2d 37 (Wash. 1987). In addition, the Restatement (Second) of Contracts § 211 (1981) provides:

A recipient's fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

The comments to § 211 note that if the recipient should have discovered the falsity by making a cursory examination, his reliance is clearly not justified and he is not entitled to relief; he is expected to use his senses and not rely blindly on the maker's assertions. *Id.* at cmt. b.

Weiss testified that he had the estoppel certificate in his possession, but failed to make even a cursory examination of it. Had the document been lengthy, his failure to examine it would have been understandable. Yet this document was one page in length with a clear heading reading "Tenants verification of Existing Lease/ Estoppel Certificate," thus making Weiss' failure to perform even a cursory examination unreasonable. We cannot conclude that an experienced businessperson such as Weiss could be so misled by this document. Accordingly, we hold that the district court erred in finding that the Yees could not rely on the estoppel certificate signed by Weiss.

The district court also concluded that Weiss was not individually liable on the lease merely because he had signed his name a second time following the printed word "INDIVIDUAL." The district court based its conclusion on its finding that Weiss had been unaware of the significance of this second signature at the time he entered into the lease. We have frequently held that a district court's findings of fact will not be disturbed unless clearly erroneous. *See* Hermann Trust v. Varco-Pruden Buildings, 106 Nev. 564, 796 P.2d 590 (1990). In the instant case, the district court found that there was insufficient evidence to indicate that Weiss intended to be personally liable on the lease by means of this second signature. The evidence presented supports such a finding. Therefore, we conclude that the district court did not err in holding that Weiss was not personally liable on the lease.

In summary, we hold that the district court erred in concluding that the Yees constructively evicted Weiss. Weiss was not con-

structively evicted and, as such, breached his lease. In light of our conclusions, we need not address appellant's other assertions of error. We hereby reverse the decision of the district court and remand for proceedings consistent with this opinion.

SPRINGER, J., with whom STEFFEN, J., agrees, concurring:

I concur with the Majority Opinion reversing the judgment of the trial court. I would, however, add a note relating to the decision-making process employed by Judge Breen, as I believe that the error committed in this case can be directly traced to the district judge's practice of having the plaintiff and defendant submit written draft judgments favoring their respective sides and then signing one or the other attorney drafts as the court's judgment.

At oral argument we heard both counsel tell us about Judge Breen's practice in deciding bench trials. Rather than announcing his decision to the parties and counsel, the judge asks plaintiffs' counsel to prepare findings, conclusions and judgments that favor plaintiffs' side and asks defendants to do the same thing in favor of the defendant's side. Under this practice,[1] Judge Breen decides

---

[1] Judge Breen's practice of accepting two opposing, written draft decisions prepared by counsel for both plaintiff and defendant and then simply choosing one or the other was explored by the court during oral argument in this fashion:

*The Court:*

Counsel, I found interesting this case because in the eighteen years that I practiced law I had never had a judge ask both counsel to prepare findings of fact and conclusions of law. Is this a common practice nowadays? Is it common in Washoe County?

*Appellant's Counsel:*

. . . . I have not encountered it before this case. . . .

. . . .

There was never a decision from the bench. There was never a written decision. There was never any information about why the judge decided the way he did.

*The Court:*

Why did he?

. . . .

*Counsel:*

Well, it's not in the record, but I will tell you that he did express disapproval of an opinion from this court, but he wouldn't identify what it was. And something like, "Let's see what they do with this." He never gave me—I still don't know, to this day, what was the deciding factor in Judge Breen's mind. And that's very troubling because part of what a judgment's supposed to do, I think, is to tell the people, to tell people, like my client and myself, "No, this is not the way you do it. You do it this way." Instead of just blindside from above, all of a sudden this decision comes out without any reasoning, without any recital of why, and, as a result, the parties on appeal and this court'll

cases by choosing one submitted judgment form or the other and thereafter signing the one that he likes best as the final factfinding, legal conclusions and judgment of the court.

It is, of course, common for judges to ask a prevailing party, *after the court's decision has been announced,* to draft a *proposed* set of findings and judgment. This is not what happened here. Without knowing who won, counsel for plaintiff and defendant were ordered to submit their respective versions of how a judgment might look should one or the other be fortunate enough to obtain a favorable decision. The judge's ordering the *losing* party to prepare a *winning* judgment is obviously a waste of that attorney's time and the client's money. I have never heard of a judge's doing anything like this. I hope we will see no more of it.

Some may think that judicial decision-making by choosing between two contradictory, prefabricated, attorney-generated documents is acceptable judicial process; but I do not. I find no appellate decisions which discuss this novel practice, but I suspect that this is because no judge has been found, as a matter of

---

have to pick through the record trying to figure out what in the "wide world of sports" went on.

. . . .

. . . . And that issue [vital points relating to releases and unpaid rent] was never addressed by the trial court. We don't have a clue as to why, even if this man was constructively evicted, why doesn't he have to pay for the time he was there?

. . . .

*The Court:*

And your opponent didn't put anything in there [in the judgment prevailing counsel prepared for the judge's signature] about the rent?
*Counsel:*

No, but he did put some things in about attorney's fees that we also find objectionable.

. . . .

*The Court:*

Counsel, when the judge asked both counsel to prepare findings of fact and conclusions of law and, I assume, judgment, did he indicate how he was going to rule?
*Respondent's Counsel:*

He did not. . . .

. . . .

*The Court:*

. . . . Have you seen this practice before, Mr. McElhinney?
*Counsel:*

I have with Judge Breen. Yes sir, I have—where there's a simultaneous submitting; and I lost at that procedure just like I won at that procedure.
*The Court:*

Luck of the draw. . . . Your turn this time, huh?

Oral argument, March 16, 1994.

record, to employ such a practice. Nonetheless, for myself, I would reverse the judgment in this case on this ground alone.