**ST. LOUIS NORTH JOINT VENTURE, an Ohio partnership, Plaintiff–Appellee,**

v.

**P & L ENTERPRISES, INC., an Illinois corporation, Patrick Newman, Cheryl L. Newman, Leonard Gall, and Lucinda Gall, Defendants–Appellants.**

**No. 96–3388.**

United States Court of Appeals, Seventh Circuit.

Argued April 11, 1997.

Decided June 19, 1997.

---

John B. Alsterda, Gini S. Marziani (argued), Davis, Mannix & McGrath, Chicago, IL, for plaintiff–appellee.

Francis J. Giganti (argued), Huntley & Giganti, Springfield, IL, for defendants–appellants.

Before CUDAHY, FLAUM and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

Defendant-appellant P & L Enterprises, Inc., operator of a "Mr. Bulky's" franchise, a retailer of bulk candy products and related novelty items, entered into a ten-year commercial lease in June of 1990 with plaintiff-appellee St. Louis North Joint Venture for space in the Jamestown Mall. St. Louis brought the present action after P & L, without prior notice, closed Mr. Bulky's and vacated the premises in October of 1992. St. Louis sought damages for breach of the lease from P & L, as well as from the four individual defendants, Patrick Newman, Cheryl L. Newman, Leonard Gall and Lucinda Gall, joint and several guarantors of P & L's performance under the lease.[1] Alleging that it

---

1. Jurisdiction in this case is based on diversity of citizenship. Plaintiff St. Louis is an Ohio partnership, whose partners are all citizens of Ohio. Defendant P & L is an Illinois corporation and

was constructively evicted, P & L counterclaimed. The district court granted summary judgment for St. Louis. We affirm.

## I.

Having chosen the Jamestown Mall as the future site of its Mr. Bulky's franchise, P & L entered into a ten-year lease in July of 1990 with St. Louis, the landlord of the Jamestown shopping center. One of the reasons P & L selected this location was the proposed expansion of the Jamestown Mall. Anticipating "a great economic boom" from the planned renovations and the addition of two "anchor" stores and forty-five specialty shops, Mr. Bulky's opened its doors in November of 1991. Although the proposed mall expansion project began in April of 1992, the economic boom predicted by the defendants did not materialize.

In business from November 1991 until October 1992, Mr. Bulky's never realized a profit. From the beginning of its lease, P & L failed to pay real estate taxes owed to the plaintiff, and, as of June 1992, stopped paying rent altogether. P & L attributes Mr. Bulky's poor performance to reduced traffic to the Mall resulting from the construction. Specifically, it claims that the closure of the east parking lot, the area in the closest proximity to the store, from April 1992 until November 1992 and the intermittent closure of the east mall entrance reduced customer traffic to the store by approximately forty percent. According to P & L, when it closed the store and vacated the premises in October of 1992, it had already been constructively evicted.

St. Louis argues that no reasonable jury could conclude that the changes necessitated by the construction operated as a constructive eviction. It is uncontested that the construction did not interfere with the ability of Mr. Bulky's customers or employees to enter or leave the store itself. The closed east entrance was one of five entrances to the Jamestown Mall, so that direct access to the mall's common areas remained possible through a west entrance and a northeast entrance, as well as through the Dillards and Sears department stores. Further, St. Louis points to the declining sales of another Mr. Bulky's store operated by P & L in the St. Louis area as evidence that Mr. Bulky's poor performance cannot be attributed to the mall's renovation. The Mr. Bulky's operated by defendants in South County Mall similarly experienced a thirty-seven percent decrease in sales during the same period, though there was no construction at that shopping center.

After Mr. Bulky's ceased operations, St. Louis' leasing agent, David Stec, took steps to relet the premises. Stec placed advertisements in national shopping center trade publications, identified prospective tenants, and contacted national tenants at other shopping centers, as well as local retailers, to suggest the location to them. Stec also personally contacted several companies, including The Limited, Petri, Women's World, Maurice, Kenny Shoes and U.S. Shoes. Negotiations began with a prospective tenant, Pandora's Canvas, in February 1993, culminating in the execution of a lease in September 1993.

The district court concluded that no reasonable jury could find that P & L had been constructively evicted, and granted summary judgment for St. Louis. The court also found that St. Louis had taken reasonable steps to mitigate its damages. P & L appeals both of these determinations.

## II.

We first address defendants' contention that the district court erred in granting summary judgment for St. Louis on the breach of contract claim. We review the district court's grant of summary judgment de novo, reading the record in the light most favorable to the non-moving party. *Geier v. Medtronic, Inc.*, 99 F.3d 238, 240 (7th Cir.1996); *Testerman v. EDS Technical Products Corp.*, 98 F.3d 297, 301 (7th Cir.1996). "[S]ummary judgment is appropriate only if there remains no issue of material fact and the moving party is entitled to judgment as a matter of law." *Testerman*, 98 F.3d at 301.

---

the individual defendants, the Newmans and the Galls, are citizens of Illinois.

The Newmans and the Galls each own fifty percent of P & L's stock. Leonard Gall was the company's president.

Under Illinois law, "constructive eviction requires that the landlord have done something of a grave and permanent character with the intention of depriving the tenant of the enjoyment of the premises." *Metropolitan Life Ins. Co. v. Nauss*, 226 Ill.App.3d 1014, 168 Ill.Dec. 887, 891, 590 N.E.2d 524, 528 (1992); *Advertising Checking Bureau, Inc. v. Canal–Randolph Assoc.*, 101 Ill. App.3d 140, 56 Ill.Dec. 634, 639, 427 N.E.2d 1039, 1044 (1981). "Where premises leased are rendered useless to the tenant or the tenant is deprived, in whole or in part, of the possession and enjoyment thereof as the result of the wrongful act of the landlord, there is a constructive eviction." *Metropolitan Life Ins.*, 168 Ill.Dec. at 891, 590 N.E.2d at 528.

Viewing the facts of this case in the light most favorable to P & L, we nevertheless agree with the district court that no rational trier of fact could find in P & L's favor. The mall entrance nearest Mr. Bulky's, closed only sporadically, was one of five entrances to the mall, and it is undisputed that customers and employees had access to the store through these entrances at all times during construction. The parking lot nearest Mr. Bulky's was closed for only six months and reopened shortly after P & L abandoned the premises.[2] The inconveniences necessitated by the construction cannot be considered "grave and permanent," nor could St. Louis' actions be considered "wrongful" or to have been done "with the intention of depriving [P & L] of enjoyment of the premises." *See Metropolitan Life Ins.*, 168 Ill.Dec. at 891, 590 N.E.2d at 528. The renovation and expansion of the mall was contemplated by both parties prior to their entering into the lease. It was, in fact, according to defendants' own testimony, a motivating factor in their selection of the Jamestown Mall location. P & L could not reasonably have believed that this expansion project would be undertaken without construction and some accompanying inconvenience. To the contrary, the lease deals explicitly with the construction and, specifically, the closure of certain common areas. Article 8, section 1 provides:

> LANDLORD shall have the right to close all or any portions of the Common Areas ... to permit alterations of existing buildings and other improvements or the construction of additional buildings and other improvements, including underground or multi-level parking facilities.

St. Louis' temporary closing of one entrance to the Mall, far from a "wrongful act," was expressly permitted under the terms of the lease.

We next consider P & L's claim that it was entitled to a hearing on the issue of whether St. Louis took reasonable steps to mitigate its damages. After the district court entered summary judgment for defendants on the issue of liability, the court directed St. Louis to file a statement, supported by affidavits or other discovery materials, setting forth the efforts taken to mitigate the damages caused by P & L's breach of the lease and demonstrating that its efforts to mitigate damages were reasonable. As the district court noted, under Illinois law, the landlord has the burden of proving mitigation of damages as a prerequisite to recovering damages. *See Snyder v. Ambrose*, 266 Ill.App.3d 163, 203 Ill.Dec. 319, 320, 639 N.E.2d 639, 640 (1994) (interpreting 735 ILCS 5/9–213.1). The defendants were instructed to respond to St. Louis' statement by setting forth how and to what degree St. Louis' actions were not reasonable. The court informed the parties that a hearing would be granted only if it appeared that material issues of fact precluded resolution of the damages claim on the pleadings.

2. Although the non-movant is entitled on a motion for summary judgment to have all reasonable inferences drawn in its favor, *see Testerman*, 98 F.3d at 301, the court is not required to draw unreasonable inferences from the evidence. The unprofitability of Mr. Bulky's cannot reasonably be attributed solely to the closure of the east entrance and parking lot. P & L's sales and customer figures for its two St. Louis Mr. Bulky's franchises show contemporaneous declines, suggesting that factors other than the construction were affecting Mr. Bulky's profitability. P & L has also presented no evidence that the construction forced other tenants of the Jamestown Mall to vacate.

St. Louis then submitted to the district court an affidavit of David Stec, the leasing representative of the Jamestown Mall, setting forth the steps taken to relet the premises. This affidavit included the names of the stores he contacted and the publications in which he advertised the vacant space. Stec also opined, based on his experience and knowledge of the market conditions in 1993, that it was not uncommon for a landlord to take in excess of twelve months to relet a unit the size of the Jamestown store. The defendants responded with an assertion that Stec's affidavit was insufficient proof that St. Louis had made reasonable efforts to mitigate its damages. Yet defendants offered no evidence to refute Stec's claim that he undertook the steps outlined in his affidavit, nor did they offer any evidence suggesting that the time taken by St. Louis to relet the premises was, contrary to Stec's assertion, objectively unreasonable.

Rule 56(e) of the Federal Rules of Civil Procedure makes clear that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, ..., must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). As the district court concluded, Stec's affidavit, uncontested by defendants, was sufficient to satisfy plaintiff's burden of demonstrating reasonable efforts at mitigation. The district court was not required to hold an evidentiary hearing, as the defendants failed to demonstrate the existence of any issue of material fact.

■ Defendants, nevertheless, argue that a hearing was necessary to enable them to cross-examine Stec. They offer no explanation, however, as to why they could not discover any facts relevant to the issue of mitigation through the discovery process, despite their apparently having had ample opportunity to do so. Plaintiff did not move for summary judgment until after the close of discovery; in addition, defendants requested and received two extensions of time in which to file their statement regarding the mitigation of damages issue. At oral argument, counsel for P & L conceded that they had not sought discovery on this issue. Had circumstances existed that prevented the defendants from obtaining facts essential to support their motion in opposition to plaintiff's request for damages, they could have requested that the district court grant a continuance. See FED. R. CIV. P. 56(f) ("Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavits facts essential to justify the party's opposition, the court may refuse the application ... or may order a continuance...."). No such request was made. Summary judgment for St. Louis on the mitigation of damages issue was therefore appropriately granted.

The defendants also maintain that the district court erred in finding that the guarantors were required to plead failure to mitigate as an affirmative defense and that their failure to do so resulted in waiver of this argument. No Illinois court has ruled on the issue of whether a landlord's statutory duty to mitigate damages extends to guarantors of a lease obligation and, if so, which party should bear the burden of proof. In light of our conclusion that St. Louis has met its burden of demonstrating that it took reasonable efforts to mitigate damages, resolution of this state law issue is unnecessary. Even if we were to assume *arguendo* that St. Louis owed a duty to mitigate damages to the individual guarantors and that it bore the burden of proof on this issue, we would conclude that St. Louis had satisfied its burden.

For the foregoing reasons, the judgments of the district court granting summary judgment for St. Louis on the issue of damages and liability are

AFFIRMED.