DECADE 80-I, LTD., by Jeffrey Keierleber, its general partner, Plaintiff-Appellant,

v.

PDQ FOOD STORES, INC. OF MADISON, and Nash-Finch Company, Defendants-Respondents.

Court of Appeals

*No. 98–0810. Submitted on briefs February 1, 1999.—Decided March 24, 1999.*

(Also reported in 593 N.W.2d 94.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Steven P. Bogart* and *Colleen D. Ball* of *Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C.* of Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Chris J. Trebatoski* of *Michael Best & Friedrich* of Milwaukee.

Before Brown, Nettesheim and Anderson, JJ.

BROWN, J.   This case is about a retail store tenant's rights when its landlord fails to repair potholes in the parking lot and the lease contains a provision requiring the landlord to maintain the parking area. When the landlord did not repair the potholes after the tenant notified the landlord that the potholes were a problem, the tenant quit paying rent and vacated. The landlord sued for the rent. The tenant claimed the landlord had breached the lease, entitling it to terminate the relationship. We deem the main question on this appeal to be whether the tenant must prove considerable damages to the business in order to show that a breach of the lease was "substantial" enough to allow rescission. Because the parking area maintenance pro-

vision in the lease was part of the bargain between the parties, we hold that the landlord's failure to repair gives the tenant the right to get out of the lease without proving substantial damage to business interests. We thus affirm.

This is the second time this case comes to us. The first time, PDQ Food Stores, Inc. of Madison and Nash-Finch Company (PDQ), the tenant, appealed from a summary judgment entered in favor of Decade 80-I, Ltd. (Decade), the landlord. We held that summary judgment was inappropriate as material facts were still in dispute. *See Decade 80-I, Ltd. v. PDQ Food Stores, Inc.*, No. 95–3507, unpublished slip op. at 6 (Wis. Ct. App. Jan. 22, 1997). On remand, we asked the trial court to resolve what we considered to be two factual questions: (1) did the existence of potholes constitute a breach of the lease? and (2) did the construction of other establishments on outlots reduce the size of PDQ's parking lot in violation of the lease? The trial court found that the potholes did constitute a breach of the lease, but that the construction on the outlots had not reduced the parking area in violation of the lease. Decade appeals the first result.

The relevant facts are as follows. The lease between PDQ and Decade was entered into by their predecessors-in-interest in October 1978. In an October 28, 1992 letter, PDQ provided notice of default to Decade that "the driveways, walkways and parking lots of the Shopping Center have not been maintained and at present contain numerous potholes." The letter further warned Decade that PDQ would "declare the lease terminated and void and . . . vacate the . . . premises" if the "defaults [were] not cured within 30 days." On November 23, Decade responded to PDQ in a letter stating that it would repair the potholes when con-

struction of a nearby McDonald's was complete. On December 2, PDQ notified Decade that since "[t]he defaults . . . ha[d] not been cured within the allotted notice period," it "declare[d] the Lease terminated and void" and would vacate within thirty days. PDQ moved out later that month.

We first document the language from the relevant portions of the lease. Under one provision, "[a]s *additional rental*, Tenant shall pay to Landlord . . . [a] sum . . . to be applied toward the estimated reasonable cost of . . . maintaining, repairing . . . the parking areas." (Emphasis added.) Under a paragraph entitled REPAIRS AND MAINTENANCE, the "Landlord shall repair, replace and maintain the common areas of the Shopping Center, including sidewalk, parking areas and driveways." It is important to underscore the language used by the parties here. They agreed that PDQ would pay an additional sum over and above the rent of the premises in return for a well-maintained parking lot. Finally, there were default provisions, one of which reads as follows:

> *DEFAULT BY LANDLORD.* Tenant shall give Landlord written notice of any default by Landlord in the performance of any covenant or obligation to be kept or performed hereunder, and if such default continues for a period of thirty (30) days after receipt by Landlord of a written notice from Tenant specifying such default, then and in such event, Tenant at its election may declare this Lease terminated and void and vacate demised premises within an additional period of thirty (30) days, paying rent only to the day of said vacating.

Decade makes two arguments on appeal. First, Decade claims that "PDQ failed to prove that the potholes constituted a default that would justify termi-

nating the lease" because it did not show that the potholes "deprived it of the use of its property for a material period of time." Second, Decade asserts that it was not able to repair the potholes within the thirty-day period because of inclement weather. This, Decade argues, was a circumstance "beyond its reasonable control" that, under the lease, excused its failure to repair.[1]

We address Decade's impossibility of repair argument first. Whether it was impossible for Decade to make repairs during the thirty-day cure period is a question of fact. Thus, we will uphold the trial court's conclusion in this matter as long as it is supported by the record. *See* § 805.17(2), STATS.; *Gerth v. Gerth*, 159 Wis. 2d 678, 682, 465 N.W.2d 507, 509 (Ct. App. 1990).[2]

---

[1] In addition to the provisions previously quoted, the lease also contains the following paragraph:

> Whenever a period of time is herein provided for either party to do or perform any act or thing, that party shall not be liable or responsible for any delays due to strikes, riots, acts of God, national emergency, acts of a public enemy, governmental restrictions, laws or regulations, or any other cause or causes . . . beyond its reasonable control.

[2] Decade frames this issue in terms of meeting a burden of proof and thus asserts that it is a question of law. We reject this. Though the court did use the word "sufficient" in its ruling, this is not a question of whether the combined facts add up to a particular legal standard. *See generally State v. Moederndorfer*, 141 Wis. 2d 823, 831, 416 N.W.2d 627, 631 (Ct. App. 1987) ("[W]hether a party has met its burden of proof is a question of law which this court may examine without giving deference to the trial court's conclusion."). Rather, it is a fact question: was there time to repair?

██

The trial court's findings here were supported by the evidence. The court found that "[t]here was not a sufficient showing to this Court that in the month that followed the notice that something of substantial nature to remedy the situation could not have been done." Decade dwells on the fact that asphalt plants usually close at Thanksgiving. But there were twenty-six days between Decade's receipt of notice and Thanksgiving. Decade claims that the weather during those twenty-six days made it impossible for it to properly repair the potholes. But the only testimony Decade presented in support of this claim was from its own vice president. The trial court found it telling that no one involved in the asphalt business testified as to "what could have been done or not done because of weather conditions." It is the role of the trial court, not this court, to weigh the evidence. *See Lellman v. Mott,* 204 Wis. 2d 166, 172, 554 N.W.2d 525, 527 (Ct. App. 1996). Based on our own review of the record, we cannot say that the court's finding that it was not impossible for Decade to repair the parking lot was clearly erroneous.

We now turn to the meatier question in this case: was it necessary for PDQ, in some concrete way, to show substantial damages to its business in order to establish a breach that justified terminating the lease? Decade argues that PDQ had to prove more than a mere breach. According to Decade, PDQ had to provide proof of damages resulting from the breach and it failed to meet this burden. Decade maintains that PDQ had to show the existence of one or more of the following: lost profits, loss of use of the building for a substantial period of time, an inability of suppliers or customers to get to the store, or a loss of goodwill. In support, Decade

relies on three cases: one from Wisconsin and two from foreign jurisdictions.

Because this claim requires us to determine the parties' rights under a commercial lease, we review it without deference to the trial court. *See Bence v. Spinato*, 196 Wis. 2d 398, 408, 538 N.W.2d 614, 617 (Ct. App. 1995) ("[T]he application of a set of facts to the terms of a commercial lease and the determination of the parties' rights under that lease present questions of law that we review independently of the trial court's determination.").

Decade first cites *First Wisconsin Trust Co. v. L. Wiemann Co.*, 93 Wis. 2d 258, 286 N.W.2d 360 (1980), to support its claim that PDQ did not show a substantial breach which would justify termination of the lease. In *First Wisconsin*, the tenant suffered fire, water and other damage. *See id.* at 265, 286 N.W.2d at 363. The tenant alleged that because these problems caused it to cease business temporarily, it stopped paying rent and the landlord sued. *See id.* at 262, 265, 286 N.W.2d at 362, 363. The tenant claimed that it was justified in terminating the lease because the landlord had breached by, inter alia, failing "to make necessary repairs of constant damage to the leased premises." *Id.* at 265, 286 N.W.2d at 364. However, the court pointed out, "A trivial breach is not sufficient, but the breach must be substantial and of such duration that it can be said that the tenant has been deprived of the full use and enjoyment of the leased property for a material period of time." *Id.* at 268, 286 N.W.2d at 365 (quoted source omitted). The court held that the incidents cited by the tenant, including the temporary cessation of business, "did not amount to a deprivation of the beneficial enjoyment of the premises." *Id.* at 269, 286

48

N.W.2d at 365. Decade claims that the same is true here—that any inconvenience suffered by PDQ was not substantial.

Decade apparently contends that because the *First Wisconsin* court mandated proof of more than temporary cessation of business, it thus set forth a strong causation element regarding any claim of breach. In Decade's view, the case stands for the proposition that the breach must seriously affect the interests of the business before recovery will be allowed, as a matter of law.

Decade attempts to bolster this interpretation with *Yee v. Weiss*, 877 P.2d 510 (Nev. 1994). There, a commercial tenant quit paying rent after complaining that parking in the business complex was inadequate. *See id.* at 511. The Nevada Supreme Court held that not enough evidence had been presented to show constructive eviction. *See id.* at 512. The court noted that the tenant "provided . . . no concrete proof that his business was substantially and adversely affected by the parking situation." *Id.* Decade would have us interpret the court's statement that "it is necessary to provide more persuasive evidence than simply verbal complaints," *id.*, to mean that evidence such as lost profits must be shown in a commercial constructive eviction case.

Finally, Decade cites *St. Louis North Joint Venture v. P & L Enterprises, Inc.*, 116 F.3d 262 (7th Cir. 1997). There, the owner of a shopping mall undertook an expansion project, which necessitated the closing of areas of the parking lot during construction. *See id.* at 264. One of the mall tenants quit paying rent and claimed that it had been constructively evicted by the landlord's failure to remedy the parking lot situation. *See id.* The court held that the inconveniences in park-

49

ing lot entrances and exits shown by the tenants could not be considered "grave and permanent," as required to show constructive eviction under Illinois law. *See id.* at 265 (quoted source omitted). The court noted that customers had access to the store and that the entrance nearest the store was closed only sporadically and only for a period of six months. *See id.* Furthermore, the construction project had been contemplated by both parties prior to entering into the lease. *See id.* Taking all of these factors into account, the court concluded that "no rational trier of fact could find in [the tenant's] favor." *Id.*

Based on these three cases, all parking lot cases, Decade argues that the parking lot problem must cause substantial damages in order for the tenant to prevail. There are two problems with Decade's reliance on these cases. First, not one of the cases says that substantial damages to business interests, such as lost profits, must be proven in order to show a substantial breach in a commercial setting.[3] In all three cases the inconveniences shown were not enough to constitute constructive eviction. But nowhere do the cases say that proof such as lost profits was necessary. We cannot distill a well-defined rule requiring proof of lost profits and the like from the general statements in the cited cases.

Second, and more importantly, this is not a constructive eviction case. The cases Decade relies upon tell us that in order to show constructive eviction a tenant must prove that the premises are "unfit for . . . the purposes for which they are leased." *First Wisconsin*, 93 Wis. 2d at 267–68, 286 N.W.2d at 365. While proof of lost profits might well be persuasive in showing

---

[3] Nor has our independent research found any case requiring proof of lost profits to show constructive eviction.

that a leased property is unfit for commercial purposes, PDQ does not claim that the property is unfit for its intended use. Rather, PDQ claims that Decade made an agreement to do something, to do it within a certain time period, and then did not do it. In short, this is not a constructive eviction case alleging unfitness of property and the case law concerning constructive evictions is simply not relevant here.

The covenant at issue in this case is a specific provision requiring maintenance of the parking lot, not the covenant of quiet use which is the basis of constructive eviction cases. It makes sense that a commercial retail lease would contain a specific covenant for parking lot maintenance for aesthetics and the convenience of customers, if nothing else. For these reasons, a well-maintained parking lot is very important to a retailer, as the testimony in this case and common sense show. The inclusion of the maintenance provision in the lease was part of the bargain struck between PDQ and Decade just as much as the rent was. PDQ is entitled to the benefit of that bargain. Nothing in the covenant envisions that the tenant must prove the infliction of actual economic loss before invoking the remedies provided. Furthermore, to read in such a requirement would be an unfaithful interpretation of the lease. *See Sampson Invs. v. Jondex Corp.*, 176 Wis. 2d 55, 62, 499 N.W.2d 177, 180 (1993) (noting that when interpreting a lease "the office of judicial construction is not to make contracts or to reform them, but to determine what the parties contracted to do"). In construing the lease, we must apply its unambiguous language—here, a specific promise to maintain a parking lot. Case law interpreting the covenant for quiet enjoyment need not come into play; the language of the lease itself, the embodiment of the parties' bargain, controls.

To rule otherwise would render largely illusory any specific agreement that the owner of commercial property keep the parking lot well maintained. In a commercial setting, it will almost always be difficult for a tenant to prove a connection between large potholes in a parking lot and loss of profits. Knowing this, the landlord could simply ignore its agreement to maintain the parking lot, understanding that its failure to act would rarely result in any significant consequences. We refuse to offer a free pass to landlords to ignore contractual agreements. If the owner of commercial property agrees to keep a parking lot maintained, and rent is paid partly in consideration for that promise, then a breach of that promise is grounds for terminating the lease, whether the breach causes lost profits or not. The tenant, after all, is paying for parking lot maintenance and expects the lot to be kept in good condition. The tenant should be allowed to obtain the full measure of its expectations without having to prove a dent in profits.

In addition to the clear promise to maintain the parking area, this lease also dictated the available time for curing a default and the tenant's remedy when a default was not cured. The landlord had thirty days to repair, which it did not do in this case. The tenant, then, had the option to "declare this Lease terminated and void and vacate demised premises within an additional period of thirty (30) days, paying rent only to the day of said vacating." Here, PDQ had the right under the lease to avail itself of that remedy. Thus, the trial court's judgment is affirmed.

*By the Court.*—Judgment affirmed.