Jerome A. BENCE, Jr., Plaintiff-Appellant-Cross Respondent,

v.

James A. SPINATO and Auto Services Associates, Inc., Defendants-Respondents-Cross Appellants,

FALLS CAR WASH, INC., Defendant.

Court of Appeals

*No. 94–1575. Submitted on briefs April 27, 1995.—Decided August 16, 1995.*

(Also reported in 538 N.W.2d 614.)

On behalf of the plaintiff-appellant-cross respondent, the cause was submitted on the briefs of *Gary R. Schmaus* of *Schmaus Law Office* of Germantown.

On behalf of the defendants-respondents-cross appellants, the cause was submitted on the brief of *James R. Sommers* of *Hunter & Sommers* of Waukesha.

Before Anderson, P.J., Nettesheim and Snyder, JJ.

SNYDER, J.   Jerome A. Bence appeals from a judgment dismissing his claim for damages he suffered as a result of removing underground storage tanks (USTs) on property that he leased to James A. Spinato. Bence argues that Spinato is responsible for the costs associated with the removal and clean up of the USTs because Spinato either owned the USTs or was liable under the terms of the lease. We conclude that Bence became the owner of the USTs by virtue of the original owner's abandonment and that the lease did not contemplate liability for the removal of the USTs.

Spinato cross-appeals from that portion of the judgment dismissing his claim for specific performance or damages as a result of Bence's failure to honor Spinato's option to purchase clause in the lease. We conclude that Spinato was in default of the lease at the time he attempted to exercise the option and that Bence properly terminated the lease prior to Spinato's request. Accordingly, we affirm the trial court's judgment in its entirety.

## FACTS

The issues in this case arise out of a parcel of land in Menomonee Falls, Wisconsin, that Bence owned and leased to various parties for the primary purpose of operating a car wash. On January 15, 1969, Bence entered into a lease agreement with Edick Laboratories, Inc., which sold Penny-Wise Car Wash franchises. Under this lease, Bence agreed to construct a Penny-Wise Car Wash on the premises pursuant to certain agreed upon plans and specifications. Edick agreed to install all equipment necessary for the operation of the car wash and all equipment relating to the sale of petroleum products.

Spinato and his corporation, Auto Services Associates, Inc., commenced operation of the car wash upon its completion pursuant to various agreements with Edick. None of these agreements were produced at trial. However, Spinato testified based on his recollection that he entered into a sublease agreement for the real estate, a franchise agreement and a purchase-lease agreement for the car wash equipment. Pursuant to the equipment lease, Spinato agreed to pay Edick $50,000 over five years, after which he would own the equipment.

According to Spinato, the USTs and pumping equipment necessary for the sale of gasoline were already installed on the premises when he first took occupancy of the car wash. Spinato further testified that the purchase-lease agreement with Edick for the car wash equipment did not include the USTs or any equipment related to the sale of gasoline. Spinato speculated that Edick separately contracted with Mobil Oil Company to provide the gasoline equipment and USTs because Mobil was his supplier at the outset of his operation. However, it is unclear from the record

whether Edick owned the USTs or whether it contracted with Mobil to install the USTs and then leased them from Mobil.

At some point in early 1971, Edick filed for bankruptcy. Spinato testified that he did not purchase any of Edick's property from the bankruptcy trustee. Rather, he simply stopped paying the equipment lease and "assumed the equipment that was there." In March 1971, Mobil informed Spinato that it would no longer supply gas, and removed its pumps and equipment, but made no demands as to the USTs. Similarly, there is no evidence in the record that the bankruptcy trustee made any claim to the USTs as Edick's property. Accordingly, the USTs remained on the property.

On March 26, 1971, Spinato contracted with Union Oil Company of California (Union 76) to supply gasoline and pumping equipment in order to continue both the gasoline and car wash operation. On December 31, 1971, he entered into a twenty-year lease with Bence for the car wash and premises. The lease included an option to purchase after the expiration of the twenty-year term. Spinato operated the car wash and sold gasoline until some time in 1983. In December 1983, he subleased the car wash to Falls Car Wash, Inc., which was principally owned by Richard Bernhardt. Bernhardt operated the car wash and sold gas until sometime in 1988 when he determined that the sale of gasoline was no longer profitable.

On December 2, 1988, the Village of Menomonee Falls Fire Department notified Bernhardt that the abandoned USTs had to be removed pursuant to Wisconsin law.[1] Bernhardt failed to remove the USTs. During 1989 and 1990, Bernhardt failed to pay certain

---

[1] WISCONSIN ADM. CODE § IND 8.225(2) states in relevant part:

real estate taxes and municipal sewer and water bills pursuant to the terms of the lease. Consequently, on September 27, 1991, Bence sent a letter to Bernhardt informing him that he was in default of the lease.

On November 13, 1991, Bence filed a small claims action against Spinato and its sublessee, Falls Car Wash, seeking eviction, a judgment for the delinquent taxes and sewer and water charges, and a determination terminating the option to purchase under the lease as a result of the default. However, Spinato did. not receive the summons and complaint until December 10, 1991. In the meantime, on November 30, Spinato sent a letter informing Bence of his intent to exercise his option to purchase the premises.

On December 16, 1991, Spinato answered Bence's small claims complaint and filed a counterclaim, seeking specific performance of the option to purchase clause in the lease. Spinato subsequently amended his pleadings, alleging in his counterclaim that he had suffered damages in excess of $20,000 as the result of Bence's failure to honor the option to purchase. Because Bence's claim alleged damages in excess of the small claims court's jurisdiction, the case was transferred to circuit court.

On June 16, 1993, Bence filed an amended complaint in which he alleged that in addition to the delinquent taxes and sewer and water charges, he had since suffered substantial damages for the proper removal of the USTs and a sludge tank, and that such clean up was Spinato's responsibility as owner of the tanks. Spinato answered and denied any ownership of the USTs.

(2) TANKS CONSIDERED ABANDONED. Tanks placed in a "temporarily out of service" condition for more than 90 days shall be considered abandoned and be subject to removal or abandonment in place . . . .

After a two-day bench trial, the court in a written decision awarded Bence a judgment for the delinquent taxes, water and sewer bills, plus interest and penalties. However, the court denied any damages for the cost of the removal of the USTs based on its conclusion that Bence owned them. The court also dismissed Spinato's counterclaim for specific performance of the option to purchase or damages in lieu of specific performance, concluding that Spinato was in default of the lease at the time of his request to exercise the option. Bence appeals and Spinato cross-appeals from the judgment. We will discuss additional relevant facts pertaining to Spinato's cross-appeal when we address that issue.

## APPEAL

On appeal, Bence argues that Spinato was the owner of the tanks and therefore the trial court erred in failing to award him the costs he incurred for the removal of the USTs, the environmental clean up, the restoration of the site and the clean up of the sludge tank. Regarding the ownership of the USTs, the trial court concluded as follows:

> The USTs were placed upon the property by a prior tenant, one [Edick] Laboratories, Inc. At the time of that lease . . . Spinato was an agent and/or employee of [Edick]. The court finds that Spinato has no responsibility to the proceedings in question because of his association with [Edick]. . . . Under the terms of their agreement, [Edick] was responsible for the placement of the USTs. Under normal landlord/tenant procedure, the USTs became the property of Bence as lessor upon the termination of his business arrangement with [Edick].

. . . The terms of the lease which allow the tenant, Spinato here, to remove certain improvements cannot be extended to include the USTs. The ownership of the USTs was never transferred by Bence.

The trial court's conclusion regarding ownership of the USTs and responsibility for clean up includes both findings of fact and conclusions of law. We will not overturn the trial court's findings of fact unless they are clearly erroneous. Section 805.17(2), STATS. However, the application of a set of facts to the terms of a commercial lease and the determination of the parties' rights under that lease present questions of law that we review independently of the trial court's determination. *See Foursquare Properties Joint Venture I v. Johnny's Loaf & Stein, Ltd.*, 116 Wis. 2d 679, 681, 343 N.W.2d 126, 127 (Ct. App. 1983).

In order to determine who owned the USTs at the time Bence removed them, it is necessary to first consider who owned them originally. Our review of the record reveals that the trial court did not make a specific finding regarding original ownership of the USTs. The court merely found that the USTs were "placed upon the property" by Edick. A logical inference from this finding is that Edick owned the USTs. However, an equally logical inference, based on the facts in the record, is that Edick contracted with Mobil to install the USTs and pumping equipment, and then leased them from Mobil.

Although the court did not make an explicit finding as to the original owner, the court significantly found that Spinato *did not* own the USTs. Based upon our review of the record, we conclude that this finding is not clearly erroneous. Regarding the initial owner-

ship, Bence argues that "[n]owhere in the record does it appear that the title to, or ownership of, the [USTs] was handled separately by the parties." We disagree.

■

Despite the fact that none of the agreements between Edick and Spinato were produced at trial, Spinato's undisputed testimony was that his equipment lease with Edick did not include any equipment related to the sale of gas or the USTs. The trial court is the ultimate arbiter of credibility of witnesses, *Bank of Sun Prairie v. Opstein*, 86 Wis. 2d 669, 676, 273 N.W.2d 279, 282 (1979), and in this case it deemed Spinato's testimony to be credible.

We further conclude that the trial court's lack of a finding as to the original owner of the tanks is not fatal to the trial court's ultimate conclusion of law that Bence became the owner of the USTs. Regardless of whether Mobil or Edick originally owned the USTs, it is clear that the USTs were abandoned shortly after Edick filed bankruptcy. If Mobil owned the USTs, it abandoned them after retrieving the pumping equipment in March 1971. If Edick owned the USTs, the bankruptcy trustee must have abandoned them within Edick's bankruptcy early in 1971. There is no evidence in the record that the bankruptcy trustee made any claim to the USTs.

■

We therefore must apply the fact that the USTs were abandoned within the context of landlord/tenant law. It is generally recognized, and undisputed by both parties, that underground fuel tanks installed by a lessee constitute "trade fixtures." *See, e.g., Standard Oil Co. v. LaCrosse Super Auto Serv., Inc.*, 217 Wis. 237, 244, 258 N.W. 791, 794 (1935); *see also Sgro v. Getty Petroleum Corp.*, 854 F. Supp. 1164, 1179 (D. N.J.

1994) (and cases cited therein). Trade fixtures ordinarily belong to the lessee and are removable by the tenant at the expiration of the lease term. *Appliance Buyers Credit Corp. v. Crivello*, 43 Wis. 2d 241, 253, 168 N.W.2d 892, 898 (1969).

However, if a lessee fails to remove the trade fixtures within a reasonable time after termination of the agreement, it is presumed under common law that the tenant has abandoned them and the fixtures become part of the realty owned by the lessor. *See Sgro*, 854 F. Supp. at 1180; *Modica v. Capece*, 189 A.D.2d 860, 861 (N.Y. App. Div. 1993); *Wolfen v. Clinical Data, Inc.*, 19 Cal. Rptr. 2d 684, 689 n.2 (Ct. App. 1993). Accordingly, we conclude that the USTs became Bence's property after they were abandoned by either Edick or Mobil. Therefore, the trial court properly concluded that Bence owned the USTs.

Bence argues that upon the termination of Edick's lease, Spinato stayed on the premises, negotiated a new lease and used all of the trade fixtures originally installed as he previously had under the Edick lease. We interpret this argument as questioning whether the USTs were ever actually abandoned. We conclude that they were.

Our research reveals that some courts hold that trade fixtures are not deemed abandoned where a tenant conditionally sells trade fixtures to a subsequent tenant who plans to carry on the same business and the landlord knows of the arrangement. *See Central Chrysler Plymouth, Inc. v. Holt*, 266 N.W.2d 177, 180 (Minn. 1978). However, Bence cannot avail himself of such an exception based on the facts of record. First, Bence neglects to mention the fact that Spinato did not

sign a lease with Bence until December 31, 1971, some nine months after Edick's demise. Second, the only evidence in the record regarding ownership after Edick's bankruptcy was Spinato's undisputed testimony that he did not purchase any gasoline-related equipment. There is no evidence of an arrangement between Edick and Spinato to continue the business or Bence's knowledge of such an arrangement.

■

Bence also argues that the following provision in the lease is evidence that Spinato owned the USTs:

> The Lessor hereby waives the right to claim as real estate any trade fixtures affixed to the leased premises, and the same may be removed by the Lessee upon the termination of this Lease, provided that the Lessee will repair any damages occasioned by such removal.

We disagree. This provision merely reiterates the common law rule that trade fixtures are removable by the lessee.

■

Bence further questions how Spinato was able to sell the car wash equipment to Bernhardt if Bence acquired title to the trade fixtures by virtue of abandonment.[2] According to Bence, "[i]t would seem not

---

[2] Bence also points to the testimony of Bernhardt to support his argument that Spinato owned the USTs. Bernhardt testified that the USTs were on an equipment list that he furnished to his bank for purposes of obtaining financing when he purchased the car wash equipment from Spinato. However, there is no evidence in the record which would indicate that Spinato generated the equipment list referred to by Bernhardt or that Spinato made any representations to Bernhardt that he owned the USTs.

only reasonable and logical, but beyond question to conclude that upon Edick's bankruptcy, [Bence] either became the owner of all of the fixtures on the premises or none of them." Bence's "logic" fails to recognize that Spinato had a purchase-lease agreement with Edick for the car wash equipment and no such agreement for the gasoline-related equipment. It is true that Spinato testified that he did not believe that he paid the entire amount agreed upon for the car wash equipment prior to Edick's bankruptcy. However, the question of whether Spinato properly asserted ownership over the car wash equipment after Edick's bankruptcy is irrelevant to the question of ownership of the USTs, and therefore we need not address it further.[3]

Last, Bence argues that regardless of whether Spinato owned the USTs, the terms of the lease required Spinato to pay for their removal. Specifically, Bence argues that the following provision imposes such liability:

> Upon the expiration or other termination of this Lease, the Lessee shall surrender to the Lessor the leased premises and all buildings and improvements thereon, in as good order and condition as they shall be at the beginning of the term of this Lease, ordinary wear and tear and damage by the elements excepted.

[3] Although we conclude that ownership of the car wash equipment is not at issue, we note that one possible explanation for Edick's or the bankruptcy trustee's failure to claim the car wash equipment was suggested by Spinato at trial. Spinato testified that he and other Penny-Wise Car Wash franchisees were pressuring Edick because the car wash equipment did not function properly.

Bence contends that contamination related to the sale of gas does not constitute normal wear and tear, and that Spinato violated this provision because he received an uncontaminated site at the beginning of the lease and returned it in a contaminated state subject to the Village of Menomonee Falls clean up order.

The trial court referred to this provision as merely a "general upkeep provision[ ]" and concluded that the lease was silent as to any consideration of removal of the tanks because "[t]he parties did not envision this problem." We agree with the trial court that this provision does not bind Spinato to the clean up costs requested by Bence. The USTs were required to be removed because they were no longer being used, not because of their condition. It is true that Bernhardt, not Bence, decided to stop selling gasoline, thereby triggering the removal order. However, as we concluded above, Bence owned the premises and the USTs, and nothing prevented him from including a requirement in the lease that the lessee continue to sell gasoline or pay for the tanks' removal in the alternative.

We acknowledge that this is a harsh result against Bence, considering that he may not have realized that he was the owner of the USTs. However, we view both Bence and Spinato as relatively innocent parties under the facts of this case. The damages suffered were created by a third-party abandoning the USTs and by the later enactment of state law requiring the removal of abandoned underground storage tanks and clean up of surrounding premises. Nevertheless, we cannot conclude that the provision relied on by Bence or any other

provision of the lease contemplated liability for the clean up associated with removal of the USTs.[4]

## CROSS-APPEAL

Spinato cross-appeals from the portion of the judgment dismissing his counterclaim for damages based on Bence's refusal to honor the option to purchase clause in the lease. We begin our discussion of this issue by setting forth additional facts and portions of the lease relevant to the option to purchase.

According to the lease between Bence and Spinato, Spinato had the option to purchase the leased premises after the twenty-year term. In order to exercise this option, Spinato was required to give written notice of his intent no later than thirty days prior to the expiration of the lease.[5] The lease also contained a termination clause requiring Bence to give Spinato

---

[4] Bence also argues on appeal that Spinato should be held responsible for the clean up associated with a sludge tank which collected both solids and wastewater from the car wash operation. However, other than identifying this additional expense, Bence fails to provide any legal argument in his brief-in-chief regarding why he is entitled to such damages or why the sludge tank is different from the USTs. This court generally will not decide issues that are undeveloped or inadequately briefed. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633, 642 (Ct. App. 1992).

[5] The relevant portion of the option clause provides:

> Upon the expiration of the original 20 year term of this Lease, [Spinato] shall have the right and option to purchase the leased premises for the sum of $125,000.00, which option may be exercised by mailing notice of [Spinato's] intention to exercise the option to Lessor not later than 30 days before the expiration of this Lease.

thirty days to cure any default prior to terminating the lease.[6]

On September 27, 1991, Bence sent a notice of default to Spinato's sublessee, Falls Car Wash, based upon its failure to pay delinquent real estate taxes and sewer and water bills as required under the lease, stating in part:

> As you are aware, under the lease agreement these items are your responsibility. It is a position of your landlord, that you are in default under the terms and conditions of said lease and this letter is your 30 day notice to cure these items. In the event that the same are not cured within 30 days of the date of this letter, we will have no alternative but to terminate the lease forthwith.

On November 13, 1991, Bence filed a small claims eviction action against Spinato and Falls Car Wash based on the alleged breach of the lease. However, the small claims summons and complaint were not served on Spinato until December 10, 1991. In the meantime, on November 30, 1991, Spinato mailed notice to Bence of his intent to exercise the option to purchase. On December 6, 1991, Bence sent a letter to Spinato informing him that the option to purchase was void

---

[6] The lease contained the following termination clause:

10.1. No default whatsoever or breach of covenant hereunder shall be deemed to have occurred on the part of Lessee hereto until 30 days after written notice of such default or breach shall have been given to Lessee and said Lessee within such time shall have failed to remedy the default or breach . . ..

10.2. If Lessee shall not remedy such default within the periods above provided after notice has been given or are not then engaged in good faith in remedying the default, this Lease may be terminated at Lessor's option.

because Spinato was in default based upon his sublessee's failure to pay the delinquent taxes, past sewer and water bills, and failure to remove the USTs pursuant to the order from the Village of Menomonee Falls.

The trial court denied Spinato's counterclaim for damages as a result of Bence's failure to honor the option to purchase. In doing so, the court concluded, in part, as follows:

> [N]otwithstanding the default provisions . . . of the lease, . . . Bence's actions in the commencement of a lawsuit alleging that Spinato had failed to pay delinquent real estate taxes for 1989 and 1990, and further to pay sewer and water charges due the Village of Menomonee Falls, which action was commenced on November 13th, 1991, served as the notice in question, and thereafter the failure of Spinato to cure the default within 30 days for whatever reason terminated the lease and any rights that Spinato may have had to purchase the same.

In his cross-appeal, Spinato argues that the trial court erred in determining that Bence terminated the lease before Spinato exercised his option. Whether Bence properly terminated the lease requires us to interpret the lease and apply landlord/tenant statutes to the undisputed facts. These are questions of law that we review independently of the trial court's determination. *See Foursquare Properties*, 116 Wis. 2d at 681, 343 N.W.2d at 127 (interpretation of a lease is a question of law which we review de novo); *State v. Wilke*, 152 Wis. 2d 243, 247, 448 N.W.2d 13, 14 (Ct. App. 1989) (application of a statute to a set of undisputed facts is a question of law).

Spinato contends that under the plain meaning of the termination clause, Bence could have terminated the lease only if he informed Spinato in writing of any default and thirty days had passed without the default being remedied. Spinato argues that the first written notice he received was upon receiving the small claims summons and complaint on December 10, 1991. Therefore, the earliest that Bence could have terminated the lease was January 9, 1992, well after November 30, 1991—the date Spinato gave notice of his intent to exercise the option to purchase.

We agree with Spinato that the trial court erred in concluding that the date Bence filed the small claims suit—November 13, 1991—served as the proper thirty-day notice to Spinato such that the lease was terminated prior to Spinato's November 30 letter. However, this does not automatically warrant a reversal. If a trial court reaches the correct result based on erroneous reasoning, we will affirm. *State v. Amrine*, 157 Wis. 2d 778, 783, 460 N.W.2d 826, 828 (Ct. App. 1990). We may sustain a trial court holding on a theory or reasoning not presented to the trial court. *Id.* We do so here.

We agree with Bence that proper notice was given under the termination clause when Bence informed Spinato's sublessee, Falls Car Wash, about the default on September 27, 1991. According to the express terms of the lease, "the word[s] 'Lessor' and 'Lessee' shall be deemed to include the heirs, executors, administrators, successors, *sublessees* and assigns of the parties." (Emphasis added.) Therefore, the notice given to sublessee Falls Car Wash constituted proper notice to lessee Spinato.

Bence's notice letter stated that if the default items were not cured within thirty days, the lease would be terminated "forthwith." Further, § 704.17(3), STATS., 1991-92, provides that if a tenant under a lease for more than one year breaches a condition of the lease, the tenancy *is terminated* provided that the landlord gives the tenant thirty days after notice of the breach in which to comply.[7] Accordingly, we conclude that the lease and option to purchase were properly terminated thirty days after Bence's September 27 letter, prior to Spinato's attempt to exercise the option.

*By the Court.*—Judgment affirmed.

---

[7] Section 704.17(3)(a), STATS., 1991-92, states in relevant part:

> If a tenant under a lease for more than one year . . . breaches any other covenant or condition of his lease, the tenancy is terminated if the landlord gives the tenant notice requiring him to . . . otherwise comply with the lease . . . .