WESTHAVEN ASSOCIATES, LTD., Plaintiff-Respondent-Cross-Appellant,

v.

C.C. OF MADISON, INC. d/b/a Cost Cutters, Defendant-Appellant-Cross-Respondent.

Court of Appeals

*No. 01–1953. Submitted on briefs March 14, 2002.—Decided August 29, 2002.*

2002 WI App 230

(Also reported in 652 N.W.2d 819.)

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of *Stephen J. Nording* and *Laura E. Callan* of *Solheim Billing & Grimmer, S.C.*, Madison.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *Todd G. Smith* of *La Follette Godfrey & Kahn*, Madison.

Before Dykman, Deininger and Lundsten, JJ.

¶ 1. LUNDSTEN, J. C.C. of Madison, Inc. (Cost Cutters) rented space in a mall owned by Westhaven Associates, Ltd. (Westhaven). Cost Cutters breached its lease by vacating, and Westhaven sought to enforce various lease provisions. The parties dispute whether stipulated damages provisions in the lease are reasonable, and thus enforceable liquidated damages provisions, or unreasonable, and thus unenforceable penalty provisions. Following the terminology used in the seminal case on this topic, *Wassenaar v. Panos*, 111 Wis. 2d 518, 521, 331 N.W.2d 357 (1983), we use the term "stipulated damages" to mean the damages specified in the lease and "liquidated damages" to mean reasonable and enforceable stipulated damages. The parties also dispute whether the lease permits Westhaven to recover attorneys' fees it incurred in its attempt to enforce various lease provisions against Cost Cutters.

¶ 2. The circuit court concluded that the stipulated damages provisions were unreasonable and there-

fore unenforceable penalty provisions. The circuit court also awarded attorneys' fees to Westhaven relating solely to Westhaven's attempt to enforce lease provisions against Cost Cutters. We reverse both decisions and remand.

## *Background*

¶ 3. The parties stipulated to the facts necessary for the resolution of this case. Westhaven owns the Westhaven Village Shopping Center (Shopping Center). On July 28, 1997, Cost Cutters entered into a lease with Westhaven. Cost Cutters leased about 17% of the available rentable space in the Shopping Center. The lease term was ten years.

¶ 4. On October 9, 1999, Cost Cutters closed its store without Westhaven's approval. At this time, the lease rate was $49.58 per day. Before the parties entered into the lease on July 28, 1997, the Shopping Center's occupancy rate was 71%. The Shopping Center's occupancy rate fluctuated after the parties signed the lease, dropping to 53% in October 1999 prior to Cost Cutters' departure. By March 2000, the occupancy rate increased to 72%. From February 1, 2000, forward, Cost Cutters did not pay rent. In accordance with the lease, Westhaven attempted to find a new tenant for the Cost Cutters space. The space remained vacant until it was leased to a third party beginning December 1, 2000.[1] Westhaven then sued Cost Cutters seeking attorneys' fees, rent, and contract damages relating to the approximately thirteen-month period the space remained unoccupied.

---

[1] By agreement of the parties, Cost Cutters sublet its space on December 1, 2000. Whether the space was sublet or relet is not pertinent to our inquiry.

¶ 5. Westhaven sought relief under paragraph 14.00 of the lease entitled "Default by Tenant." Paragraph 14.00 sets forth Westhaven's remedies in the event Cost Cutters "defaults in the payment of Minimum Rent or other charges or in the performance of any other of Tenant's obligations hereunder, and fails to remedy such default within ten (10) days after written notice from Landlord . . . ." Paragraph 14.00 presents Westhaven with two options if Cost Cutters fails to remedy its default: first, Westhaven can terminate the lease, reenter the premises, and recover from Cost Cutters "any sums due Landlord for rent or otherwise to the date of such entry," and liquidated damages; second, Westhaven can choose to not terminate the lease and attempt to relet in its own name for the remainder of the term and then recover from Cost Cutters "any deficiency . . . between the amount for which the premises were relet, less expense of reletting, including all necessary repairs and alterations and reasonable attorney's fees and the rent provided hereunder."

¶ 6. Westhaven exercised the second option under paragraph 14.00. There was no dispute that under this paragraph Westhaven was entitled to the lease rate of $49.58 for each day between October 9, 1999, when Cost Cutters vacated, and December 1, 2000, when the space was sublet. However, the parties dispute whether Westhaven was entitled to certain attorneys' fees pursuant to paragraph 14.00. Westhaven sought $15,670 in attorneys' fees consisting solely of fees relating to its litigation with Cost Cutters.

¶ 7. In addition, Westhaven's exercise of the second option under paragraph 14.00 permits Westhaven to seek stipulated damages under paragraphs 3.02 and 8.00(n) of the lease. Paragraph 3.02 requires Cost

Cutters to pay Westhaven $20 per day if Cost Cutters fails to keep its premises open for business during "normal business hours." Westhaven argued that it was entitled to $20 per day for each violation of paragraph 3.02 from October 14, 1999, to November 30, 2000. Paragraph 8.00(n) of the lease requires Cost Cutters to pay a sum equal to Cost Cutters' normal daily rent for each day Cost Cutters fails to keep its premises open for business during specified "minimum hours."[2] Westhaven argued that it was entitled to an amount equal to the daily rent for each violation of paragraph 8.00(n) from October 14, 1999, to November 30, 2000.

¶ 8. Both parties sought summary judgment. Cost Cutters argued that the attorneys' fees sought by Westhaven are not covered under paragraph 14.00 because those fees were not incurred for the purpose of finding a new tenant for the space vacated by Cost Cutters. Cost Cutters also argued that paragraphs 3.02 and 8.00(n) (collectively the "failure to do business" provisions) are unenforceable penalty provisions.

¶ 9. The circuit court determined that Westhaven was entitled to recover attorneys' fees as a result of Cost Cutters' breach of the lease. But the circuit court ruled that the "failure to do business" provisions contained in paragraphs 3.02 and 8.00(n) were unreasonable and, therefore, unenforceable.

---

[2] Westhaven contends "normal business hours" and "minimum hours" are two different concepts under the contract. In Westhaven's view, normal business hours are the typical business hours of a business such as Cost Cutters, while "minimum hours" are the specified hours the Shopping Center is open for business. Westhaven argues that the two provisions target two different activities and are thus not penalty clauses. Cost Cutters disagrees with this analysis. For reasons we discuss below, we need not address this issue.

¶ 10. Cost Cutters appeals the circuit court's award of attorneys' fees and Westhaven cross-appeals the circuit court's determination that the "failure to do business" provisions were unenforceable.

## *Discussion*

¶ 11. Cost Cutters appeals and Westhaven cross-appeals the circuit court's grant of summary judgment. We review summary judgment decisions *de novo,* applying the same methodology as the circuit court. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). That methodology is well established and need not be repeated here. *See, e.g., Lambrecht v. Estate of Kaczmarczyk,* 2001 WI 25, ¶¶ 20–24, 241 Wis. 2d 804, 623 N.W.2d 751.

*A. Cost Cutters' Appeal of the Award of Attorneys' Fees*

¶ 12. The parties agree that under the lease, attorneys' fees are recoverable only as an expense of reletting. However, they disagree as to whether the attorneys' fees claimed in this action constitute an expense of reletting. "[T]he application of a set of facts to the terms of a commercial lease and the determination of the parties' rights under that lease present questions of law that we review independently of the trial court's determination." *Bence v. Spinato,* 196 Wis. 2d 398, 408, 538 N.W.2d 614 (Ct. App. 1995).

¶ 13. We are required to determine whether the attorneys' fees incurred by Westhaven as a result of this action are properly characterized as an expense of

reletting. Wisconsin follows the American Rule, under which "parties to litigation are generally responsible for their own attorney's fees unless recovery is expressly allowed by either contract or statute, or when recovery results from third-party litigation." *DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 571, 547 N.W.2d 592 (1996). We "will not construe an obligation to pay attorneys' fees contrary to the American Rule unless the contract provision clearly and unambiguously so provides." *Hunzinger Constr. Co. v. Granite Res. Corp.*, 196 Wis. 2d 327, 340, 538 N.W.2d 804 (Ct. App. 1995).

¶ 14. As best we understand Westhaven's argument, it begins with the premise that Westhaven has the right to recover the deficiency between the rent and liquidated damages owed by Cost Cutters and the rent received by Westhaven from any new tenant. From this premise, Westhaven reasons it is entitled to recover attorneys' fees incurred in the process of recovering such a deficiency, regardless whether the attorneys' fees are incurred for the purpose of re-renting the space to a third party or for the purpose of pursuing an action against Cost Cutters. Westhaven says it "simply seeks the attorney fees that it incurred when it was forced to sue Cost Cutters to recover the deficiency in rent it experienced after Cost Cutters moved out of the mall and stopped paying rent."

■

¶ 15. However, the lease's plain language does not permit Westhaven to recover attorneys' fees incurred in pursuing rent deficiencies and stipulated damages from Cost Cutters. Rather, the lease language limits recovery of attorneys' fees to those related to efforts to "relet." We conclude that litigation expenses in a suit against Cost Cutters are not expenses related to an attempt to relet to a third party. The record reveals that Westhaven's

attorneys' fees were incurred as a result of litigation against Cost Cutters. Therefore, Westhaven is unable to collect any of the attorneys' fees, and we reverse the circuit court's decision.

### B. Westhaven's Cross-Appeal on the Enforceability of the "Failure to Do Business" Provisions

¶ 16. Westhaven argues that the uncontested facts show that the "failure to do business" provisions are not unenforceable penalty provisions. The review of a stipulated damages provision is a mixed question of law and fact. *Wassenaar*, 111 Wis. 2d at 525. Normally, "because the trial court's legal conclusion, that is, whether the clause is reasonable, is so intertwined with the factual findings supporting that conclusion, the appellate court should give weight to the trial court's decision, although the trial court's decision is not controlling." *Id.* However, where the parties have stipulated to the facts, and thus the circuit court makes no factual findings, only legal issues remain and, therefore, our review is *de novo. Lewis v. Physicians Ins. Co. of Wis.*, 2001 WI 60, ¶ 9, 243 Wis. 2d 648, 627 N.W.2d 484; *see Bence*, 196 Wis. 2d at 408 (we review application of a set of facts to the terms of a commercial lease and the determination of the parties' rights under that lease *de novo*).

¶ 17. A stipulated damages provision will be enforced if it is reasonable under the totality of the circumstances. *Wassenaar*, 111 Wis. 2d at 526. The court looks at several factors to determine reasonableness: "(1) Did the parties intend to provide for damages or for a penalty? (2) Is the injury caused by the

breach one that is difficult or incapable of accurate estimation at the time of contract? and (3) Are the stipulated damages a reasonable forecast of the harm caused by the breach?" *Id.* at 529–30 (footnotes omitted). Essentially, we must look at both the "harm anticipated at the time of contract formation and the actual harm at the time of breach." *Id.* at 532. The factors are not meant to be mechanically applied, and courts may give some factors greater weight than others. *Id.* at 533.

¶ 18. Courts generally assume that "bargains are enforceable and that the party asking the court to intervene to invalidate a bargain should demonstrate the justice of his or her position." *Id.* at 526. At least in situations like the one before us, where neither party complains of inequity in bargaining power, *see id.* at 536, the party seeking to avoid a stipulated damages provision bears both the "burden of proving facts which would justify the trial court's concluding that the clause should not be enforced" and the burden of persuading the court that the provision should not be enforced. *Id.* at 526, 539–40; *see also Northwestern Motor Car, Inc. v. Pope,* 51 Wis. 2d 292, 295, 187 N.W.2d 200 (1971). Thus, here, where the facts are uncontested, Cost Cutters bears the burden of persuading this court that the stipulated damages provisions are unreasonable.

*1. Whether the Parties Intended the Provision to be a Liquidated Damages Provision or a Penalty*

¶ 19. The first factor we examine when determining the reasonableness of a stipulated damages provision is whether the parties intended the provision to

800

provide liquidated damages or to provide a penalty. As explained in *Koenings v. Joseph Schlitz Brewing Co.*, 126 Wis. 2d 349, 377 N.W.2d 593 (1985), this factor is "rarely helpful" because the parties' intent has "little relevance to what is reasonable in law." *Id.* at 362. Nevertheless, we examine this topic because "the parties' intent may have some evidentiary value." *Id.*

¶ 20. Cost Cutters argues that the "failure to do business" provisions impose two different fees on the same conduct, evincing a punitive intent. In addition, Cost Cutters contends that the provisions are penalties because the provisions were part of a form lease and not geared to the particular circumstances of Cost Cutters. However, Cost Cutters fails to explain why the presence of two form provisions prohibiting the same conduct turns the provisions into an impermissible penalty. Even assuming the provisions prohibit the same conduct, it does not follow that the provisions thus become penalties. Neither case law nor logic requires a stipulated damages provision to appear but once in a contract in order to be enforceable. Moreover, the stipulated damages provisions, taken together, set the damages at an amount tied to Cost Cutters' base rent, which is presumably based on the amount and location of the space leased by Cost Cutters. Therefore, the provisions, taken together, are at least somewhat tailored to the space leased by Cost Cutters.

¶ 21. Cost Cutters also argues that because neither provision requires mitigation by the landlord, the provisions are penalties, citing *Frank Nero Auto Lease, Inc. v. Townsend*, 411 N.E.2d 507 (Ohio Ct. App. 1979). *Townsend* involved a motor vehicle lease agreement that allowed the lessor to repossess an automobile and accelerate future rents upon the lessee's default. *Id.* at 511. In addition, the lease permitted the lessor to regain

possession of the vehicle and relet or resell the vehicle while collecting the full rent from the lessee for the life of the contract without any obligation to mitigate. *Id.* However, the fact that the "failure to do business" provisions do not contain mitigation clauses is not controlling in this case because a mitigation clause is contained elsewhere in the lease, unlike the lease in *Townsend.* Westhaven was required to attempt mitigation under the second option in paragraph 14.00.[3] Thus, *Townsend* is easily distinguished.

¶ 22. We do not regard the parties' arguments relating to the first factor as particularly helpful, and we move on to the other two factors.

*2. Whether the Damages Were Ascertainable at the Time of Contracting, and Whether the Stipulated Damages Reasonably Forecasted the Actual Damages*

¶ 23. The second factor used to determine the reasonableness of a stipulated damages provision examines whether the damages can be estimated *at the time of contracting.* The third factor examines whether the stipulated damages provisions are a reasonable forecast of the *harm caused by the breach. See Wassenaar,* 111 Wis. 2d at 530–31. The *Wassenaar* court stated that these two "factors are intertwined, and both use a combined prospective-retrospective approach." *Id.* at 531.

¶ 24. Although the second and third factors both use a prospective-retrospective approach, the fact remains that they require two distinct inquiries: the

---

[3] If Westhaven had chosen the first option under paragraph 14.00, there would have been no mitigation requirement, but at the same time had Westhaven chosen that first option, it could not have collected damages under paragraph 3.02 or paragraph 8.00(n).

reasonableness of the stipulated damages provision at the time of contracting and the reasonableness of the provision when compared with actual damages after a breach. *See Pollack v. Calimag,* 157 Wis. 2d 222, 240–41, 458 N.W.2d 591 (Ct. App. 1990); *see also Koenings,* 126 Wis. 2d at 371 ("The touchstone of the reasonableness under the totality of the circumstances test must still be the relationship of anticipated and actual harm to the stipulated amount of damages, as expressed in the *Wassenaar* factors."). We first address whether the "failure to do business" provisions were reasonable at the time of contracting.

### a. Time of Contracting

¶ 25. Cost Cutters first argues that the stipulated damages provisions were unreasonable at the time of contracting because the parties should have been able to predict there would be no harm beyond lost rent if Cost Cutters breached. Cost Cutters reasons that because Westhaven collects a fixed rent from Cost Cutters, rather than a variable rent based on Cost Cutters' sales, Westhaven is entitled to the same rental income whether or not Cost Cutters vacates. We disagree with Cost Cutters' reasoning.

¶ 26. Westhaven's managing general partner testified by affidavit about the harm caused by vacating businesses:

When a business fails to keep its business open, other tenants are harmed because each tenant brings potential customer foot traffic into the mall who then may shop the other businesses. Failing to remain open has a slow but certain negative effect on the value of the property because as tenants lose business and customers patronize competitor malls the rent the landlord

803

may charge to future tenants decreases and renewal rate of existing tenants decreases .... Over time, the very economic viability of the shopping center is threatened because the costs of operating the mall outweigh the rents received.

In addition, at his deposition Cost Cutters' president acknowledged the harm caused by vacancies in malls: "Why don't I build freestanding buildings? I like the traffic. They, Hollywood Video, . . . they have a lot of people every single day. That hurt my business when they went out."

¶ 27. As tenants vacate, a shopping center receives less customer traffic, potentially causing other tenants to vacate or go out of business. These consequential damages are often difficult to prove, but that does not prevent sophisticated parties from including consequential damages when estimating the damages at the time of contracting. *See Wassenaar*, 111 Wis. 2d at 535–36 (stating that parties may reasonably include in their estimates damages that reflect actual harm, rather than just the harm that may be proved in court).

¶ 28. Next, Cost Cutters argues that the provisions are unreasonable because Cost Cutters has no opportunity to cure a minor or justifiable breach. Cost Cutters alleges that such default clauses are unenforceable when any violation could trigger them, citing *Mayfield v. Hicks*, 575 S.W.2d 571 (Tex. Civ. App. 1978). Cost Cutters' reliance on *Mayfield* is misplaced. In *Mayfield*, an equipment lease permitted the lessor to declare a breach of the lease "upon the occurrence of even a minor default." *Id.* at 575. That court found that "[t]he coupling of repossession with acceleration of rent, irrespective of the type of breach, is the defect in this provision." *Id.* In contrast, under the lease here, Westhaven must give Cost Cutters written notice as well as

804

ten days to remedy the violation before declaring a breach of the lease. Thus, a minor violation of the "failure to do business" provisions will not automatically breach the lease. Although a minor violation may lead to money damages, a minor violation cannot lead to the "repossession with acceleration of rent" to which the *Mayfield* court objected.

¶ 29. Furthermore, Cost Cutters argues that the provisions are unreasonable because the "failure to do business" fees accrue regardless of the tenant mix, and would be assessed even if Cost Cutters were the only store left in the mall. This hypothetical scenario is too speculative to render the provisions unreasonable at the time of contracting. Furthermore, if this scenario had come to pass, it would have been more properly analyzed by comparing the stipulated damages provisions to the actual harm caused.

¶ 30. Cost Cutters has failed to persuade us that the "failure to do business" fees were an unreasonable estimation of Westhaven's damages. Cost Cutters did not, for example, present expert testimony that the stipulated damages provisions were unusually harsh as compared with stipulated damages provisions found in other multi-tenant retail commercial leases. To the contrary, in this case Cost Cutters' president, in his deposition testimony, admitted that similar "failure to do business" provisions are common in leases with other shopping malls.

### b. After Breach

¶ 31. Next, we turn to the question whether the stipulated damages are reasonable in light of the actual damages caused by the breach. *See Wassenaar*, 111 Wis.

2d at 530. As stated above, it is incumbent on Cost Cutters to persuade us that the damages it must pay under the contract do not reasonably relate to the actual harm suffered by Westhaven. Cost Cutters fails to meet this burden.

¶ 32. Cost Cutters argues that Westhaven suffered no harm and thus the provisions unreasonably penalize Cost Cutters. Cost Cutters contends that the lack of evidence of the Shopping Center's property value before or after Cost Cutters closed means that Westhaven did not establish any harm. However, Cost Cutters fails to appreciate that it had the burden of producing evidence of unreasonableness. Westhaven was not required to present evidence on value. *See id.* at 526 ("Placing the burden of proof on the challenger is consistent with giving the non-breaching party the advantage inherent in stipulated damages clauses of eliminating the need to prove damages . . . .").

¶ 33. Cost Cutters also argues that because the occupancy rate at the Shopping Center was low before Cost Cutters departed and actually rose after Cost Cutters left, it is obvious that Westhaven suffered no harm as a result of Cost Cutters' departure. The occupancy rate just prior to Cost Cutters' departure was 53%. About five months later, occupancy had risen to 72%. However, we are not persuaded by the occupancy rate information. Simply because the occupancy rate rose after Cost Cutters' breach does not mean that the breach caused Westhaven no harm. Based on the record before us, the most reasonable inference is that occupancy would have been even higher had Cost Cutters remained in the Shopping Center. When a mall has a low occupancy rate, it does not follow that the mall suffers no harm when a significant tenant vacates. The

record contains a letter from another tenant commenting on the harm caused by Cost Cutters' vacating:

> I have just recently learned that Cost Cutters, a solid anchor in this mall, will be moving down the street.
>
> . . . I do not believe that myself òr PD Meats will be able to survive without both a full, thriving mall with tenants that compliment each other and also an anchor . . . .
>
> I am afraid soon I'll be the only one here and [the Shopping Center] will become not a shopping destination, but a place to avoid because businesses fail and close.

In a subsequent letter, the same tenant stated: "My market study was based on the fact that there was a video store and a hair care business as [an] anchor and a draw to this Center. These business[es] have closed and moved, which has a significant impact on my bottom line."

¶ 34. We conclude that Cost Cutters has failed to meet its burden of persuasion. Cost Cutters has not shown that the stipulated damages provisions in the lease were unreasonable under the totality of the circumstances.

### *Conclusion*

¶ 35. We conclude that the plain language of the lease does not permit Westhaven to recover its attorneys' fees incurred in this suit because they are not expenses of reletting. Additionally, we conclude that Cost Cutters has failed to show that the stipulated damages provisions in the lease were unreasonable. Westhaven is entitled to stipulated damages under both

paragraphs 3.02 and 8.00(n). Therefore, we reverse both decisions of the circuit court and remand for further proceedings consistent with this opinion.

*By the Court.*—Judgment reversed and cause remanded with directions.