MORAN and others, Respondents, v. SHERN and wife, Appellants.

*No. 385.   Argued June 4, 1973.—Decided June 29, 1973.*
(Also reported in 208 N. W. 2d 348.)

40

For the appellants there was a brief by *Pfannerstill, Camp & Tyson* of Wauwatosa, and oral argument by *Richard F. Tyson.*

For the respondents there was a brief by *Frisch, Dudek, Slattery & Denny,* attorneys, and *Jerry H. Friedland* of counsel, all of Milwaukee, and oral argument by *Mr. Friedland.*

WILKIE, J. One issue is dispositive of this appeal: Did the trial court err in concluding that the agreement was unambiguous and in its construction of that agreement favorable to the Morans?

Appellants, Sherns, contend that the trial court erred in its construction of the agreement as contemplating the agreed-upon profit percentage to be computed on the basis of the improved lands (by improved lands is meant the property and new multifamily dwellings) rather than the unimproved lands which contained only a house, garage and dog kennel. According to appellants, if the contract was plain and unambiguous the court should have given it a common or ordinary interpretation—such interpretation requiring the division of profit only from the sale of the unimproved land. If, however, the agreement is ambiguous, appellants argue, then the court ought to have construed the agreement most strongly against its maker—the plaintiff-respondent Daniel F. Moran.

The trial court found the agreement *not* to be ambiguous and held the percentage figure of the net profits to apply to the land and buildings existing on the property at the time of the agreement and the improvements, construction or development of the land. The trial court stated:

"Defendants contend that the written agreement limits Moran to participation in profit from the land and existing buildings only. Plaintiffs contend that the agreement provides 40 percent of the net profit derived from the entire operation of development, improvement, construction, land, and land and buildings existing at the time of the agreement.

"An interpretation of the written agreement indicates that the provisions, concerning the basis for the 40 percent of the net profit, are stated in the conjunctive-alternative phrase of and/or. A literal interpretation of the phrase indicates that it means either 'and' or 'or' as

set forth in Webster's Dictionary. A reading of the agreement leaving out the conjunctive or alternative phrase refers to 40 percent of the net profit derived from the development, improvement, construction on, sale of the land, and land and buildings presently on the property legally described.

"The Court is satisfied that the agreement is not ambiguous, and that it provides for a payment to C. M. Moran, as Trustee of the children of Daniel F. Moran, a sum equal to 40 percent of the net profit derived from the entire development, improvement, construction on, sale of the land, and land and buildings existing on the property at the time of the agreement."

The trial court also stated that its opinion was "further bolstered" by the clause which defined net profit.

While due consideration must obviously be given by this court to a lower court's interpretation of a contract, it is not bound by such determination as where such determination involves a question of fact and not of law.[1] This principle was very recently enunciated in *American Mut. Liability Ins. Co. v. Fisher* as follows:

"It should be noted that a trial judge's interpretation of a contract poses only a question of law. . . . Where a legal question, as distinguished from a finding of fact, is involved, this court is not bound by the usual rule that we will sustain a trial court unless its findings are contrary to the great weight and clear preponderance of the evidence."[2]

This court may, therefore, interpret the instant agreement anew.

The disputed portion of the contract provides that for good and valuable consideration:

". . . John E. Shern and Mary S. Shern, also known as 'Developers' hereby agree as follows:

---

[1] *Medford Lumber Co. v. Industrial Comm.* (1928), 197 Wis. 35, 39, 221 N. W. 390.

[2] (1973), 58 Wis. 2d 299, 304, 206 N. W. 2d 152.

"1) To pay to C. M. Moran, as Trustee for the Children of Daniel F. Moran, a sum equal to 40 percent of the net profit derived from the development and/or improvement and/or construction on and/or sale of the land and/or land and buildings presently on the property legally described in the attached description. Said 'Net Profit' shall be defined as the profit after deduction of actual expenses and disbursements made in connection with the said construction, development, promotion and/or sale of said property or property and buildings. There shall also be deducted the actual monies invested by said Developers plus interest at the rate of six per cent per annum for the period said funds are invested in this project."

The first step to be taken by this court in its construction of a contract or in its interpretation is that of scrutinizing the language of that contract to determine whether ambiguity exists. If so, then circumstances extrinsic to the document itself may also be considered.[3]

The "and/or" dilemma aside,[4] an ambiguity exists when the critical paragraph is read as a whole. In the first sentence, the Sherns agree to pay 40 percent of the net profit derived from the "development . . . improvement . . . construction *on* . . . sale of the land . . . land and buildings presently on the property." (Em-

[3] *Milwaukee County v. Badger Chair & Furniture Co.* (1936), 223 Wis. 118, 125, 269 N. W. 659.

[4] *See Employers Mut. Liability Ins. Co. v. Tollefsen* (1935), 219 Wis. 434, 437, 438, 263 N. W. 376: "It is manifest that we are confronted with the task of first construing 'and/or,' that befuddling, nameless thing, that Janus-faced verbal monstrosity, neither word nor phrase, the child of a brain of some one too lazy or too dull to express his precise meaning, or too dull to know what he did mean, now commonly used by lawyers in drafting legal documents, through carelessness or ignorance or as a cunning device to conceal rather than express meaning with view to furthering the interest of their clients. We have even observed the 'thing' in statutes, in the opinions of courts, and in statements in briefs of counsel, some learned and some not."

phasis added.) This language would ordinarily point to an unambiguous interpretation that profit from the construction of apartment buildings on the land was intended by the parties to be included. In the second sentence, however, the net profit is defined as the profit remaining after expenses incurred in "said construction, development, promotion . . . sale *of* said property or property and buildings." (Emphasis added.) This language is subject to an interpretation that the parties intended to include only profits from construction of the land (in the sense of preparing it for subsequent erection of buildings) and *of* buildings, upon the land at the time the contract was entered into. This latter limitation to buildings presently on the land follows from the use of the word "said." Because the only buildings previously referred to in the agreement were the first sentence's "buildings presently on the property," the subsequent phrase "said property or property and buildings" can only mean those buildings presently on the land. While an argument can be made that the phrase "said construction" in the second sentence refers back to the construction "on" the land as used in the first sentence, the only interpretation which follows therefrom is the construction that net profit is that profit after deduction of expenses for construction and development "on . . . of" said property or property and buildings. This inconsistency between the two sentences together with the liberal utilization of the "thing" (and/or) leads us to the conclusion that the contract is ambiguous.[5]

Since there is ambiguity in the agreement, two further rules are brought into operation: (1) Where ambiguity is found extrinsic circumstances may be resorted to in order to ferret out the intent of the parties; [6] and

---

[5] *Employers Mut. Liability Ins. Co. v. Tollefsen, supra,* footnote 4, at page 438. *See also: Sipple v. Zimmerman* (1968), 39 Wis. 2d 481, 496, 159 N. W. 2d 706: ". . . Where a contractual provision may be reasonably taken in more than one sense it is ambiguous."

[6] *Supra,* footnote 3.

(2) it is well recognized in this jurisdiction that ambiguous agreements are to be construed most strongly against the maker or drafter.[7]

In the instant case, it is undisputed that the entirety of the agreement between the parties is not embodied in the written document. On direct examination Moran testified that when he discovered Grass's inability to go through with their plans for the multiple units he approached Shern with the idea of a partnership agreement. Moran stated that one of the reasons Shern was willing was his desire to gain experience in the construction of apartment buildings. During their negotiations, according to Moran, he outlined his part of the joint enterprise as including the already obtained rezoning plus the obtaining of permits, sub-bids, plans, and state approvals. Moran noted he also stated to Shern that he would work with the surveyors and engineers with respect to topography, drainage and installation of sewer and water lines to service the property. Shern's part of the venture, according to Moran, was to obtain financing for the project.

Moran further testified that the services he rendered after the date of the agreement, June 19, 1967, included the inspection of an apartment building which was under construction in Hales Corners and the obtaining of plans for such a building from the architect who also agreed to make minor modifications. Moran also stated that he and Shern viewed an apartment with floor plan identical to that outlined in the plans in order to inspect the exterior facade. He also testified that he received from the persons building the Hales Corners project a list of their subcontractors and the subcontract bid amounts in order to more adequately judge their bids. Moran also stated his services included the obtaining of drawings for buildings and the processing of applications with the

[7] *See, e.g., Ebenreiter v. Freeman* (1956), 274 Wis. 290, 296, 79 N. W. 2d 649.

Wisconsin Industrial Commission and the Hartland Plan Commission. Further services, according to Moran, included appearances before these boards. He also stated he referred to Shern potential customers who were interested in the lots which were not to be developed. According to Moran some of these referrals resulted in sales.

Moran testified he did additional work for Shern which included obtaining permits for a building which Shern's son-in-law was building on the land. He also arranged the details of a trade of a parcel of their property for property in Brookfield, Wisconsin. Moran also stated he was responsible for the sale of "several lots" to a person with whom he had discussed the desirability of building in Hartland.

On cross-examination Moran denied representing the first purchasers of the property, the Grasses, in the capacity of an attorney, and also denied receiving legal fees for services performed. Moran acknowledged that the rezoning had been obtained in 1966 while the Grasses still possessed the property. When asked whether he had obtained plans for the housing units prior to the date of the contract, Moran replied that he could not recall. Additional cross-examination elicited Moran's testimony that he did not supervise any of the subcontractors who worked on the buildings and obtained none of the material for construction. Moran also stated the extent of his financial investment was his "numerous trips to Madison."

Defendant John Shern testified that the agreement only contemplated that Moran was to deliver the building permits for each building and to handle the zoning before the Hartland zoning authorities. Shern testified that negotiations contemplated Moran would receive "40 percent of any profit derived from the existing buildings on the land." Shern denied that there were any negotia-

tions concerning the sharing of profit of new buildings to be constructed. Shern testified he put up all the money and that he never had a partner who did not participate financially. When asked whether Moran objected to the financial statement prepared on March 5, 1969, which did not reflect the profit from construction of new buildings, Shern replied he did not object. Shern further stated that Moran did nothing after obtaining the building permit for the last eight-family unit built by a Mr. Behling.

On cross-examination Shern acknowledged that Moran obtained architectural drawings for the buildings and consulted him with regard to planning and development. He also acknowledged that Moran probably did refer potential buyers to him. Shern further admitted on cross-examination that services in lieu of financing are sometimes rendered in joint ventures. Finally, Shern testified that he was a "developer" and that development "means the platting, zoning, you usually stop with the topographic survey, the installation of sewer, water, underground utilities." Construction, according to Shern, would include the construction of a sewer or culvert. According to Shern the words of the contract contemplated "all the things that needed to be done to that land to render it usable to build a building on." A developer, according to Shern, does not ordinarily construct buildings on land. Shern testified, in response to the question of what is in the contract, as follows: "I say that everything that this agreement refers to is the improvement, development, and construction on that particular piece of land to render it salable so we could sell it and make a profit."

The next witness, Gregory B. Schaefer, Jr., an employee and son-in-law of defendant Shern, testified that Moran was not involved with the subcontractors, materialmen or with the supervision of the buildings' con-

struction. To his knowledge, Schaefer testified, he could not recall Moran ever visiting the construction site. Additionally he could not recall Moran ever saying anything respecting his participating in the profit on the buildings on the subject property. On cross-examination Schaefer did admit that Moran obtained the plans for a building he (Schaefer) was constructing on one of the parcels.

Orville A. Marks, a Shern employee, testified he never saw Moran at the construction site where he supervised construction and "took in the bids." On cross-examination, however, Marks acknowledged that he (Marks) had nothing to do with obtaining building permits, zoning changes, drawing plans or disposing of lots on the land.

Eugene L. Grass testified that he considered Moran his attorney at the time rezoning of the property was being sought and did, in fact, pay Moran for these services. Grass also testified that plans for the buildings had already been obtained from the architect *before* he negotiated with Shern. In response to the question of whether he regarded Moran as a joint venturer Grass responded:

"I would say he was—he was a joint adventurer with me in that I agreed to retain him to handle any legal situation that came up as a result of the construction of the buildings and eventual sale, I would say he participated in that respect."

On cross-examination, Grass stated he did receive a bill for attorney's fees from Moran. He could not recall, however, whether this amount reflected a 50/50 split in the profit.

Ralph F. Schultz, a certified public accountant, testified he prepared the financial statement or reconciliation for Shern and was present when Moran received it. Schultz stated Moran made no comment upon the statement

which omitted reference to the construction of three buildings on the land. On cross-examination, Schultz stated he made no attempt to construe the contract between the Sherns and Morans.

The final witness called was Moran who stated that he was certain a handwritten memorandum existed between him and Grass which reflected their 50/50 split agreement. Moran also testified the $3,500 Grass paid him was not an attorney's fee but part of a business agreement.

This testimony leads us to conclude, as a matter of law, that the Shern version of the agreement is correct rather than Moran's version as adopted by the trial court. Moran attempts to make much out of the fact that he did a great deal to justify the 60/40 split of the profits which he argues includes profits from the construction and subsequent sale of multi-unit apartment buildings. Yet, much of what is urged as services was already done while he and Grass were associated. Thus, the rezoning had been accomplished and the plans for buildings had been obtained before he and Shern entered into their agreement. The services which were rendered subsequent to the agreement include obtaining various permits for Shern and the builders of units on the six-acre parcel. While these services arguably support Moran's contention that he was a partner in the building-construction portion of the project, they are not inconsistent with the development of land as described by Shern—preparing the land for later construction. It is logical that persons attempting to interest potential buyers in their lots would offer to facilitate construction by taking care of the required permits and the like. It is further logical to assume that Moran, an attorney familiar with the procedures, would be expected to furnish permits for all purchasers. This does not automatically make Moran part of the building-construction aspect of the project.

It is our conclusion that the instant contract was not intended by the parties to include Moran as a 60/40 partner in profits from the construction and sale of multi-unit apartment dwellings. It is our conclusion, to the contrary, that Moran's participation was limited to those profits from the preparation of the land for subsequent construction of buildings. The drafter, an attorney, ought to have been capable of adequately drafting the document to reflect a 60/40 percent split of the profits computed *after* construction of multi-unit family dwellings or after the sale of lots to such building constructors. His inability to do so, if such were indeed the intent, should not be held against the nonlawyer nondrafter.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.