Raul J. WALTERS, d/b/a Lake Geneva Centre,
Plaintiff-Respondent,

v.

NATIONAL PROPERTIES, LLC,
Defendant-Appellant-Petitioner,

HORIZON PROPERTIES, INC., and Horizon
Convenience Stores, Inc., Defendants.

Supreme Court

*No. 2003AP862. Oral argument December 14, 2004.
—Decided June 23, 2005.*

2005 WI 87

(Also reported in 699 N.W.2d 71.)

For the defendant-appellant-petitioner there was a brief by *Thomas B. Burke,* Milwaukee, and oral argument by *Thomas B. Burke.*

For the plaintiff-respondent there was a brief by *Joseph M. Cardamone III* and *Gagliardi, O'Brien, Braden, Olson & Capelli,* Salem, and *Martin B. Carroll* and *Fox, Hefter, Swibel, Levin & Carroll, LLP,* Chicago, IL, and oral argument by *Martin B. Carroll.*

¶ 1. DAVID T. PROSSER, J. This is a review of a decision of the court of appeals, *Walters v. National Properties, LLC,* No. 2003AP862, unpublished slip op. (Wis. Ct. App. Jan. 21, 2004). In this small claims landlord-tenant dispute, we are asked to decide whether the landlord, Raul J. Walters (Walters), lawfully evicted his tenant, National Properties, LLC (National). National points to differences between the terms in its lease and the allegedly ambiguous and arguably more lenient terms in the default notice it received. National contends that because of these ambiguities and inconsistencies, it is entitled to rely on the default notice. We agree. However, even though we adopt National's ambiguity argument and permit it to rely on the default notice, National still did not timely cure its default. We therefore conclude that the eviction was lawful, and we affirm the court of appeals.

## I. FACTS AND PROCEDURAL POSTURE

¶ 2. The facts are not in dispute. Walters, d/b/a Lake Geneva Shopping Centre, operates a shopping mall in Lake Geneva. On December 23, 1993, Walters entered a ten-year renewable lease agreement with Horizon Convenience Stores, Inc. (Horizon). The leased

178

space consisted of a gasoline station and convenience store. On August 15, 1997, Horizon assigned its interest in the lease to National. The lease requires National to pay a fixed rent in equal monthly installments, due on the first day of each month. Additionally, National must pay a variable amount based on its monthly and yearly sales. National must also pay property taxes. To allow Walters to verify the amount of variable rent due, the lease requires National to report its total monthly sales as part of each month's rent payment; National also must annually report its yearly sales. Two other paragraphs—¶ 18 and ¶ 22—in the lease are of particular importance to this case:

> 18. DEFAULT AND BANKRUPTCY. If LESSEE should default in the payment of any rental or monies due hereunder, when due, or be in default of any covenant, agreement or condition herein . . . then upon the occurrence of any one or more of such contingencies and after the LESSEE has been given notice by certified mail of such default, LESSEE has thirty (30) days *after the date of such notice* to correct such default or defaults. If no such corrections are made, this lease is canceled and all rights of the LESSEE are terminated.
>
> . . . .
>
> 22. NOTICE. All notices to be given to either party by the other shall be by Certified or Registered Mail, return receipt requested, whether or not it is specifically designated as such in this lease agreement. . . . *The time of any such notice shall begin to run with the date of the mailing of such notice.* (Emphasis added.)

¶ 3. National did not submit the rent payment due September 1, 2002. Consequently, Walters mailed a default notice on September 13, 2002. He sent the notice by certified mail, pursuant to the lease. The date

"September 13, 2002" was typewritten on the notice. National received the notice on September 16, 2002. The notice alleged that National was in default in four ways: (1) Past due rent in the amount of $3421.42; (2) Failure to provide copies of all monthly sales receipts on a monthly basis; (3) Failure to provide annual sales information; and (4) Failure to pay real estate taxes for 2001. The notice also stated:

> [U]nless *such defaults are resolved* on or before the expiration of thirty (30) days after *service of this Notice,* Landlord will exercise its remedies under the Lease, including . . . the right to terminate your right to possession of the premises.
>
> Only FULL PAYMENT of the rent demanded in this Notice will waive the Landlord's right to terminate possession under this Notice, unless Landlord agrees in writing to continue possession in exchange for receiving partial payment. (Emphasis added.)

¶ 4. On October 15, 2002, National mailed a check for the overdue rent to Walters. This payment covered only the non-variable portion of the rent. Walters received the payment on October 17, 2002.

¶ 5. Believing that National's response was untimely and incomplete, Walters attempted to evict National. On November 1, 2002, Walters filed suit in Walworth County Circuit Court seeking National's eviction for failure to timely cure the "fixed monthly rent" part of the default and failure to cure the other parts of the default, including the payment of the variable part of the rent and the submission of monthly and annual receipts. On March 14, 2003, the circuit court entered judgment for Walters, evicting National. Circuit Judge John R. Race held that the language in the lease controlled: "My decision is that the landlord by mailing

had accomplished the notice requirements and he used the word service, a verb. And I believe that he complied with the lease by putting it in the mail." The court of appeals affirmed on the same grounds and we subsequently granted review.

## II. ANALYSIS

¶ 6. When we apply undisputed facts to the terms of a commercial lease, and determine the parties' rights under that lease, we exercise de novo review. *Westhaven Assoc., Ltd. v. C.C. of Madison, Inc.,* 2002 WI App 230, ¶ 16, 257 Wis. 2d 789, 652 N.W.2d 819; *Bence v. Spinato,* 196 Wis. 2d 398, 408, 538 N.W.2d 614 (Ct. App. 1995).

¶ 7. State statutes govern procedures for evicting a tenant who fails to pay rent or otherwise breaches the lease. Wisconsin Stat. § 704.17(3)(a) (2001–02)[1] describes the default notice that a landlord must provide to a tenant holding a lease of duration longer than one year. However, the statute allows a lease for more than one year to contain contrary termination provisions that will override subsection (3). Wis. Stat. § 704.17(5). The lease at issue covered more than one year and included specific provisions on termination. Therefore, in this case, we review the lease provisions, not the statute.

¶ 8. This case is unusual because the language in the default notice is not precisely the same as the language in the lease. As a result, we must resolve the threshold question of whether the "date of service" provision in the notice supersedes the "date of mailing" provision in the lease, in determining when the thirty-

---

[1] All subsequent references to the Wisconsin statutes are to the 2001–02 edition unless otherwise indicated.

day cure period begins, if we deem the two provisions inconsistent.

¶ 9. This question is further complicated by paragraph 18 of the lease. Paragraph 18 states that the tenant shall have thirty days "after the date of such notice," while paragraph 22 provides that the thirty-day period begins to run with the "date of the mailing of such notice." Both of these dates may be different from the "date of service" referenced in the default notice, depending upon the definition of "service."

¶ 10. National admits that under the lease, Walters could have demanded payment within thirty days from the date of mailing of the default notice. Clearly, the lease directs that the date of mailing of the notice, September 13, is effectively the beginning of the thirty-day cure period. National's strategy is different. It does not attack the lease provisions in any way; it argues that we should ignore the lease provisions because Walters worded his notice differently. The default notice stated on its face that National had to make payment before "the expiration of thirty (30) days after *service* of this Notice." (Emphasis added.)

¶ 11. For his part, Walters claims that the language in the notice, "thirty (30) days after service of this Notice," simply mirrors the language in the lease, "thirty (30) days after the date of such notice." As we see it, "notice" could be interpreted to mean the same thing as "service," an interpretation favorable to the tenant. It is more difficult to interpret "mailing" to mean the same thing as "service," an interpretation desired by the landlord. With perfect hindsight, we observe that if the landlord wanted his notice to accurately mirror his lease, he should have used identical language in the two documents. That would have produced clarity and ensured the unquestioned primacy of the lease. Here,

Walters did not copy the lease language in the notice; instead, he chose alternative wording.[2]

■

¶ 12. We conclude that Walters' choice of alternative wording rendered the notice ambiguous. A reasonable tenant evaluating his options might have perceived the following: (1) Paragraph 18 of the lease states that the lessee has thirty days after "the date of such notice;" (2) Paragraph 22 of the lease states that the lessee has thirty days from "the date of the mailing of such notice;" (3) the notice states that the lessee must resolve the defaults within "thirty days after service of this Notice;" (4) both the lease and the notice are silent on the definition of "service." There is no way for the lessee to determine what "service" means without reference to extraneous sources.[3]

---

[2] In some cases, equitable estoppel might bar a landlord in Walters' position from subsequently relying on the lease provisions.

Three elements are required to support application of equitable estoppel: (1) an action or inaction; (2) that induces reliance by another; (3) to his detriment. *Randy A.J. v. Norma I.J.*, 2004 WI 41, ¶ 26, 270 Wis. 2d 384, 677 N.W.2d 630. Equitable estoppel is not limited to claims brought in equity; it may also apply to "preclude the assertion of rights and liabilities under a note or contract." *Gabriel v. Gabriel*, 57 Wis. 2d 424, 428, 204 N.W.2d 494 (1973) (citing 31 C.J.S. *Estoppel* § 151).

National does not argue that it relied on the notice to its detriment. In fact, it does not invoke the doctrine of equitable estoppel at all. Thus, we disregard the theory. We note, however, that even if we had considered it, the result in this case would be the same. Equitable estoppel would allow National to rely on the language of the default notice, but it failed to comply with the terms of the notice.

[3] For example, a tenant familiar with the legal system might refer to Wis. Stat. § 801.14, which governs "Service and

183

¶ 13. In situations like these, this court has traditionally adhered to the deeply rooted doctrine of *contra proferentem,* a universally accepted legal maxim that any ambiguities in a document are to be construed unfavorably to the drafter. *Black's Law Dictionary* 328 (7th ed. 1999).[4] Since this court's earliest days, we have recognized its validity. *See, e.g., Lawe v. Hyde,* 39 Wis. 345, 359 (1876). Although the rule is most often used to interpret the terms of a contract, *see, e.g., Seitzinger v. Community Health Network,* 2004 WI 28, ¶ 22, 270 Wis. 2d 1, 676 N.W.2d 426, it has also been applied to documents such as settlement offers, *Pachowitz v. LeDoux,* 2003 WI App 120, ¶ 39, 265 Wis. 2d 631, 666 N.W.2d 88; *Stan's Lumber, Inc. v. Fleming,* 196 Wis. 2d 554, 576, 538 N.W.2d 849 (Ct. App. 1995), and exculpatory clauses, *Merten v. Nathan,* 108 Wis. 2d 205, 210–11, 321 N.W.2d 173 (1982). We see no reason why it should not also apply to the ancillary notice of eviction that Walters drafted pursuant to the termination procedure spelled out in the lease contract.

¶ 14. Under this canon of interpretation, courts construe ambiguous language "most strongly" against the drafter. *Moran v. Shern,* 60 Wis. 2d 39, 49, 208 N.W.2d 348 (1973); *accord Dieter v. Chrysler Corp.,* 2000 WI 45, ¶ 15, 234 Wis. 2d 670, 610 N.W.2d 832. The rule is often applied to "aid a party whose bargaining power was less than that of the draftsperson." 5 Corbin, *Corbin on Contracts* § 24.27, at 292 (Kniffen & Perillo ed. 1998). The Restatement of Contracts contains a

---

filing of pleadings and other papers," or even Wis. Stat. § 801.11, "Personal jurisdiction, manner of serving summons for."

[4] For a recent discussion, see *State Farm Mutual Automobile Insurance Co. v. Langridge,* 2004 WI 113, ¶ 44, 275 Wis. 2d 35, 683 N.W.2d 75.

similar provision: "In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." Restatement (Second) of Contracts § 206 (1979). The comments to Section 206 explain that the drafting party is more likely to perceive areas of ambiguity, or even to intentionally create ambiguity, intending to put forth a particular interpretation at a later date. *Id.*, cmt. a.

¶ 15. Using these principles, we note that Walters drafted both the lease and the notice. He had every opportunity to ensure clarity by employing consistency, both internally within the lease and between the lease and the notice. He did not. Walters urges that the notice's language, "service of this notice," is functionally equivalent to the lease term, "the date of such notice," and therefore the mailing date still marks the beginning of the thirty-day time period. We reject this argument because, applying the rule that ambiguity is construed against the drafter, we cannot allow Walters to mechanically equate the lease language with the default notice language. Rather, we must analyze what the language in the notice required of National in order to cure its default.

¶ 16. National relies on *Hotel Hay Corp. v. Milner Hotels, Inc.*, 255 Wis. 482, 39 N.W.2d 363 (1949), and *Boeck v. State Highway Commission*, 36 Wis. 2d 440, 153 N.W.2d 610 (1967), to support its argument that the notice is not effective until the date of service. In *Hotel Hay*, this court held that, absent anything to the contrary in the lease, a default notice became effective at the time of delivery. The court stated:

> The nature of notice required by contract depends, of course, upon the provisions of the contract. . . . *In the absence of custom, statute, estoppel, or express contract stipulation,* when a notice, affecting a right, is sought to be served by mail, the service is not effected until the notice comes into the hands of the one to be served, and he acquires knowledge of its contents.

*Hotel Hay,* 255 Wis. at 486 (emphasis added) (internal citations omitted).

¶ 17. In *Boeck,* the court reiterated the *Hotel Hay* rule that in the absence of more specific provision in a statute or a contract, a notice does not become effective until it is served on a party. *Boeck,* 36 Wis. 2d at 444. In *Boeck,* though, a statutory provision clearly governed service of the notice at issue. *Id.* Hence, far from making any sort of statement that the date of service of the notice always governs, the court in that case relied upon a statute.

¶ 18. If the terms of the lease are to control, superseding Wis. Stat. § 704.17(3)(a), the principles in the *Hotel Hay* case, and any other document, they must be clear and consistent internally and not be undermined by a subsequent Lessor-drafted document.

¶ 19. In this case, we need not decide whether the notice is functionally equivalent to the lease. There is sufficient ambiguity in the two documents that National is entitled to rely on the notice, interpreted to require receipt. This is a hollow victory, however, because National did not comply with the notice either.

¶ 20. Walters mailed the default notice on September 13. National received it on September 16. National mailed its response, including a check to cure the monetary part of the default, on October 15. Walters received the response on October 17. Therefore, while

32 days elapsed between the two mailing dates, 31 days elapsed between the two dates of receipt.

¶ 21. The only way National can prevail is if we measure the time period between National's receipt of the notice on September 16 and the mailing date of its response on October 15 (29 days). We decline to accept such a convoluted combination of the notice and the lease. National cannot have it both ways; either the dates of receipt control, or the dates of mailing control. National wants to hold Walters to one standard (the date of receipt, as expressed in the default notice) while it obeys another (the date of mailing, as expressed in the lease). As we have noted, under the doctrine of *contra proferentem,* the language in the notice must be interpreted favorably to National. But the doctrine has its limits. While the doctrine allows us to construe the ambiguity in National's favor, so that it can rely on the notice, the doctrine does not allow us to completely ignore language within the notice. It would be fundamentally unfair to allow National to rely on some provisions in the notice while effectively deleting others.

¶ 22. The notice states that "such defaults" (presumably, the four defaults mentioned in the notice) must be "resolved" within thirty days.[5] By mailing the past due rent, National attempted to cure only one of

---

[5] National argues that later in the notice, Walters stated that "[o]nly FULL PAYMENT of the rent demanded in this Notice will waive the Landlord's right to terminate possession under this Notice." National argues that we should interpret this clause to mean that it only had to cure one of the four defaults—namely, the fixed rent. It fails to realize, however, that it may have had to pay additional "rent" based on its

187

the four parts of its default. It also did not cure timely its failure to provide monthly or annual sales figures, or its failure to pay property taxes. It was in default long past thirty days, and we cannot say that it "resolved" all the defaults. Accordingly, Walters was entitled to eviction of National.

## III. CONCLUSION

¶ 23. We conclude that because of the ambiguous nature of the default notice and the lease, National had the right to rely on the terms in the default notice. In general, landlords should be held to the language in the notices they send. We have no doubt that ordinarily, landlords will fully exercise their rights under the lease—indeed, the wisest course would be to copy the lease language in the notice, and we have been presented with no explanation why the landlord did not do that here. In any event, National did not comply with the default notice's terms, and accordingly Walters lawfully evicted it. We therefore affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 24. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I agree with the majority opinion on several issues:

1. Both the default notice and the lease in the

monthly or annual sales receipts, and it did not submit those in a timely manner. Therefore, without submitting the receipts as required, it cannot show that it submitted the "rent" necessary to cure its default. Moreover, looking at the entire provision, we think National is attempting to take the "FULL PAYMENT" clause out of context.

instant case are ambiguous about curing a default, whether the documents are read independently or together.

2. When provisions in a default notice differ from those in a lease, the terms of the default notice control if the terms of the default notice are more favorable to the tenant. Accordingly, the default notice provision controls as to the calculation of the 30–day period in the instant case.

3. The general interpretive rule applicable to ambiguous documents is to construe them against the drafter. The Landlord drafted the lease and default notice in the instant case; therefore, those documents are construed against the Landlord.

¶ 25. I disagree with the majority opinion's ultimate conclusion because it is inconsistent with this applicable interpretive rule.

¶ 26. The default notice—the governing instrument here—provides that "unless [the specified] defaults are resolved on or before the expiration of thirty (30) days after service of this Notice, Landlord will exercise its remedies . . . including . . . the right to terminate [the Tenant's] right to possession." The Landlord is exercising its right to terminate the Tenant's possession under the default notice.

¶ 27. The Landlord mailed the default notice (dated September 13, 2002) by certified mail on September 13, 2002. The Tenant received the notice on September 16, 2002.

¶ 28. What is the date of "service" of the notice? September 13 or September 16? The calculation of the date of "service" of the notice is not set forth in the

189

default notice or the lease.[1] Apparently relying on the *Hotel Hay* case[2] (which is factually distinguishable), but without fully explaining its interpretation, the majority opinion interprets the date of "service" of the notice as the date the Tenant received the notice.

¶ 29. Applying the governing interpretive rule, I would interpret the default notice against the Landlord, the drafter, and would conclude that service of the notice starting the 30–day period means the date the Tenant received the notice. By using this date the Tenant will have more time to cure the default than if service of the notice were interpreted as the date of mailing.

¶ 30. I now turn to calculating the date by which the Tenant must "resolve[]" the default under the default notice. Although it is clear that the Tenant may resolve the default by paying the rent, the notice is silent about calculating the date rent was paid for purposes of calculating the end of the 30–day period. Must the Tenant personally hand over the money to the Landlord within the 30–day period after receipt of the default notice? Or may the Tenant merely place the payment in the mail properly addressed to the Landlord within the 30–day period? Or, if the Tenant mails the payment, must the Landlord actually receive the mailing within the 30–day period?

---

[1] Majority op., ¶ 8. The lease does not use the word "service"; it addresses the date of the notice (apparently September 13 here) and the date of the mailing of the notice (apparently September 13 here) as beginning the 30–day cure period.

[2] *Hotel Hay Corp. v. Milner Hotels, Inc.*, 255 Wis. 482, 486–87, 39 N.W.2d 363 (1949) (relying on the terms of the lease and Corpus Juris for the principle that service of a notice is not effected until receipt).

¶ 31. The majority opinion concludes that because it defines service of the notice as the date the Tenant receives the notice, it must define the date of resolution of the default as the date the Landlord receives the rent payment. "Why so?" I ask. Because, responds the majority, the date of receipt of service is derived from the default notice, while the date of mailing of payment is derived from the lease.[3] The majority will not allow the Tenant to "have it both ways,"[4] to have a "convoluted combination of the notice and the lease,"[5] that is, the Tenant cannot mix and match provisions from the notice and the lease.[6]

¶ 32. Assuming for the sake of argument that the majority opinion's principle against mixing and matching is sound, the principle has no application to the instant case. The Tenant's practice has been to mail the rent payment to the Landlord. The lease provides that the rent is due on the first of the month but that interest will not begin to accrue unless the Landlord receives the payment after the seventh of the month.[7] These provisions simply do not specify whether mailing or receipt of payment was to occur by the first of the

[3] Majority op., ¶ 21.

[4] *Id.*

[5] *Id.*

[6] The Tenant does argue that the language of the lease implies that rent is paid upon mailing to support its argument that the language of the notice implies the same. I do not rely on this argument.

[7] Paragraph 3 of the lease provides, "LESSEE agrees and covenants to pay LESSOR . . . an annual fixed rent . . . payable in advance in equal monthly installments on the first day of each and every calendar month during the term of this Lease and any extension thereof. If any payment of rent is not received by the seventh (7th) day of the month in which it is due

month. Therefore, the lease itself refutes the majority opinion's conclusion that the Tenant's definition of "payment" derives from the lease.

¶ 33. The majority opinion goes on to state that the Tenant's interpretation would require the court to "completely ignore language within the notice" and would allow the Tenant "to rely on some provisions in the notice while effectively deleting others."[8] Yet the majority fails to cite any such provisions. Thus, the majority opinion implies that the default notice provides that the Landlord must receive the payment of rent by the end of the 30–day period.

¶ 34. The majority opinion adopts the arbitrary rule that "either the dates of receipt control, or the dates of mailing control."[9] The majority opinion ultimately justifies this rule by claiming that any other interpretation of the time period would be "fundamentally unfair,"[10] but it fails to identify any fundamental unfairness. Furthermore, the majority opinion does not clarify whether its rule of construction applies in all cases or only in the instant case.

¶ 35. Faced with two ambiguous documents, I would in the instant case interpret the 30–day period examining only the default notice, which sets forth the 30–day period. Given that the default notice is unclear as to both the date of service and the date of payment, I would adhere to the rule that an ambiguous document should be interpreted against the drafter. Accordingly, I

and LESSOR notifies LESSEE of the same, it is agreed that a one and one half percent (1.5%) penalty per month shall be due LESSOR."

[8] Majority op., ¶ 21.

[9] *Id.*

[10] *Id.*

would give the Tenant the advantage in calculating both the date of service and the date of payment. I would say that the service of the notice is the date of receipt by the Tenant and that the date of payment of the rent is the date the Tenant mails the payment.

¶ 36. Unlike in many eviction actions, in the instant case the parties were represented by counsel. A typical tenant facing eviction and a typical landlord seeking eviction often appear in a busy small claims court without representation. Because of the press of business, the court usually has a very limited time in which to make a decision and does not have the benefit of written or oral argument by counsel or the parties.

¶ 37. The majority opinion today passes up an opportunity to provide guidance to circuit courts in eviction cases. The majority opinion states the interpretive rule correctly but inexplicably never applies it either in defining the date of service on the Tenant or in defining the Tenant's date of payment to the Landlord. I would have had this court state that in an eviction action in which both the lease and the default notice were drafted by the landlord and are ambiguous, the tenant is entitled to rely on the interpretation of the document most favorable to the tenant.[11]

¶ 38. For the reasons set forth, I respectfully dissent.

■

[11] Another issue is not sufficiently addressed in the briefs or the majority opinion, *see* majority op., ¶ 22, namely whether the Tenant loses anyway because it did not timely cure the non-monetary defaults specified in the notice. I therefore do not address that issue.