COURT OF APPEALS
DECISION
DATED AND FILED

June 29, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1149**

Cir. Ct. No. 2020CV267

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

LUANN MORASKI,

PLAINTIFF-APPELLANT,

V.

YOUR M.D., S.C. AND RICHARD LEWIS,

DEFENDANTS-RESPONDENTS.

APPEAL from a judgment of the circuit court for Ozaukee County:

SANDY A. WILLIAMS, Judge. *Reversed and cause remanded with directions*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  LuAnn Moraski appeals from a judgment declaring that she is not a shareholder of Your M.D., S.C. (the Practice) under the terms of two agreements pertaining to her purchase of a share in the Practice and dismissing her claims seeking an accounting and inspection of corporate records. The circuit court concluded that Moraski could not become a shareholder under the agreements until she had paid the full $125,000 purchase price for her share, which she had not done.  We conclude that the parties' intent as derived from the two agreements' terms was for Moraski to acquire a share from the Practice on the closing date, March 7, 2016, in exchange for an initial payment of $50,000 and an obligation to pay the $75,000 balance of the purchase price over time.  Therefore, we reverse the judgment and remand this case to the circuit court to enter declaratory judgment in Moraski's favor and for further proceedings on Moraski's claims and on Richard Lewis's counterclaim seeking to recover the outstanding balance of the purchase price.

**BACKGROUND**

¶2     The following facts are taken from the affidavits and exhibits filed by the parties in the circuit court.  Moraski and Lewis are physicians licensed to practice medicine in Wisconsin.  Lewis incorporated the Practice in April 2015. As of 2016, the Practice had issued two shares:  a "treasury share" owned by the Practice and a share owned by Lewis.  In February 2016, Lewis and Moraski discussed the possibility of Moraski acquiring a fifty percent interest in the Practice for $125,000.   They eventually agreed that Moraski would join the Practice as an owner.  On March 7, 2016, Moraski signed a one-paragraph document prepared by Lewis entitled "Stock Redemption Agreement," which states as follows:

> The undersigned subscribes for One share of the no par value Common Stock of Your M.D., S.C., a Wisconsin service corporation (the "Corporation"), having an authorized capital of Six shares, and agrees to pay $125,000 for each share subscribed for by her in cash, services or property as required by the Board of Directors of the Corporation. Said shares shall be issued to the undersigned upon such payment according to the instructions of, the undersigned to the Secretary of the Corporation. The share will be issued at closing on March 7, 2016.

¶3 According to Lewis, Moraski asked for more time to pay the full purchase price for her share, which prompted Lewis to prepare a second document, also entitled "Stock Redemption Agreement," which he and Moraski signed. Lewis executed this agreement on behalf of the Practice in his capacity as its President. We will refer to this second document as the "Second Agreement" to avoid confusion.[1] The Second Agreement states as follows:

> THIS AGREEMENT, dated as of March 7, 2016, is between Richard Lewis (the "seller"), currently sole owner of YOUR M.D., S.C., a Wisconsin service corporation (the "Company") and LuAnn Moraski (the "buyer"[)].
>
> A. The Seller currently owns 2 shares of the Company's Common Stock (the "Stock").
>
> B. The Stock constitutes all of the outstanding stock of the Company owned by the Seller. The Seller desires to sell to the Buyer, and the Buyer desires to purchase from the Seller, 1 out of 2 shares of the Stock on the terms and conditions set forth herein.
>
> AGREEMENTS
>
> In consideration of the recitals and mutual agreements contained herein, the parties agree as follows:

---

[1] Lewis's signature on the Second Agreement is dated March 7, 2016. Moraski's signature is undated.

1.  Redemption of Stock.   Subject to the terms and conditions contained in this Agreement, at the Closing (as defined below) the Seller shall sell and the Buyer shall purchase 1 share [of] Stock for $125,000 (the "Purchase Price").  The initial $50,000 of the Purchase Price shall be payable to Seller via check at Closing. The remaining $75,000 will be loaned to the Buyer with the following terms:

    - The payback will begin on the 6th month after closing, September 7, 2016.

    - The loan will be paid back to the Seller, interest-free for the first 2-3/4 years, beginning from the date of closing, March 7, 2016.

    - In the event that the loan is not paid in full by December 31, 2018, the Buyer agrees to pay the Seller a penalty no less than $25,000.  Also, whatever funds are still owed to the Seller by the Buyer wi[ll] begin accruing interest at 4% until the loan is paid in full.

¶4     Moraski paid $50,000 of the purchase price on the closing date, March 7, 2016, via check.  It is undisputed that $50,000 in profit sharing distributions owed to Moraski were used to pay down the outstanding balance and that Moraski has not paid the remaining $25,000 of the $125,000 in cash.[2]

## PROCEDURAL HISTORY

¶5     In September 2020, Moraski commenced this action invoking her rights as a shareholder to:  (1) an inspection of the Practice's accounting records under WIS. STAT. § 180.1604 (2019-20)[3]; and (2) an "accounting of all corporate financial affairs including but not limited to information related to her monthly

---

[2] According to Lewis, a penalty of $25,000 was added to the outstanding balance at the end of 2018, which Moraski owes along with interest under the Second Agreement.

[3] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

profit-sharing distribution." Lewis filed an answer denying that Moraski was a shareholder and asserting counterclaims for: (1) breach of contract; and (2) a declaration that Moraski is not a shareholder "or alternatively is a shareholder without voting rights until she has fully paid for her shares." The circuit court ordered a limited stay of proceedings and allowed the parties to conduct discovery on the issue of whether Moraski was a shareholder.[4]

¶6      Lewis subsequently filed a motion for declaratory judgment, which the circuit court heard on April 22, 2021. At the hearing, Moraski argued that the Stock Redemption Agreement and the Second Agreement memorialized a transaction in which Moraski purchased a share from the Practice for $125,000 by paying $50,000 at closing and financing the remaining $75,000 via a loan from Lewis. She argued that the parties' behavior after the closing date confirmed that she had become a shareholder on the closing date. Lewis disputed Moraski's characterization of the Second Agreement as "a loan document when in fact when you read it it's another clear description of a purchase agreement" and argued that Moraski was not a shareholder because she had not finished paying the full purchase price for her share.

¶7      The circuit court agreed with Lewis:

> And that's how the Court sees it as well. I don't see it as a loan. And I think there's some stretching going on by the plaintiff. There isn't a loan by Dr. Lewis to Dr. Moraski. And I think [the Stock Redemption Agreement] and [the Second Agreement] can be reconciled together. And I think it's unfortunate that plaintiff never completed what she was supposed to [do] to become a shareholder. And if she had, she would have had

---

[4] Moraski's claims against the Practice were stayed until the circuit court resolved Moraski's status as a shareholder.

> absolutely every right to have access to the records. That's a benefit of being a shareholder, you get to see the records. She's not a shareholder. She never completed what she needed to do to be a shareholder and defense is entitled to declaratory judgment in that respect based on the record that has been established here and in terms of the briefs that the Court has considered. And based on all of that, the Court will grant defense declaratory judgment.

The court subsequently entered a judgment declaring that Moraski "is not a shareholder of the Practice[,]" dismissing her complaint with prejudice, and dismissing Lewis's counterclaim for breach of contract as moot. Moraski appeals.

## DISCUSSION

¶8      Because the declaratory judgment in this case resulted in the dismissal of Moraski's claims, it "had the effect of a summary judgment." *Young v. West Bend Mut. Ins. Co.*, 2008 WI App 147, ¶6, 314 Wis. 2d 246, 758 N.W.2d 196. We therefore treat the declaratory judgment as an award of summary judgment in favor of Lewis. *See id.* We review the circuit court's decision "de novo, applying the same methodology as the circuit court." *Id.* Summary judgment is appropriate if the pleadings and evidentiary submissions of the parties "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." WIS. STAT. § 802.08(2).

¶9      The dispositive issue here is whether Moraski is a shareholder of the Practice. To answer that question, we look to the terms of the Stock Redemption Agreement and the Second Agreement. In construing those agreements, our goal is to ascertain and give effect to the parties' intent. *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 155 Wis. 2d 704, 711, 456 N.W.2d 359 (1990). "The best indication of the parties' intent is the language of the contract itself, for that is the language the parties saw fit to use." *Riley v. Extendicare Health Facilities, Inc.*, 2013 WI

App 9, ¶13, 345 Wis. 2d 804, 826 N.W.2d 398. "We construe the contract language according to its plain or ordinary meaning." *Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶33, 330 Wis. 2d 340, 793 N.W.2d 476.

¶10 "Where the terms of a contract are clear and unambiguous, we construe the contract according to its literal terms." *Tufail v. Midwest Hosp., LLC*, 2013 WI 62, ¶26, 348 Wis. 2d 631, 833 N.W.2d 586. However, if contract terms are ambiguous—that is, if they are fairly susceptible to more than one interpretation—then extrinsic evidence may be used to determine the parties' intent. *Id.*, ¶27. Additionally, "ambiguous contracts are interpreted against the drafter." *Seitzinger v. Community Health Network*, 2004 WI 28, ¶22, 270 Wis. 2d 1, 676 N.W.2d 426. Whether a contract is ambiguous is a question of law that we review de novo. *Spencer v. Spencer*, 140 Wis. 2d 447, 450, 410 N.W.2d 629 (Ct. App. 1987).

¶11 Contracts are read as a whole "to avoid the potential for ambiguity that can result if a small part of the agreement is read out of context." *State ex rel. Massman v. City of Prescott*, 2020 WI App 3, ¶15, 390 Wis. 2d 378, 938 N.W.2d 602 (citation omitted). "If we determine that the contract contains contradictory statements, we must attempt to harmonize them, but if it is impossible to give meaning to both parts, we must determine which part is to be given effect." *Id.*

¶12 Before addressing the parties' arguments, we pause to clarify our treatment of the Second Agreement. At the hearing on Lewis's declaratory judgment motion, Moraski's counsel declined to take an "official position" on whether the Second Agreement is authentic and enforceable because Moraski "[didn't] recall signing that document." Counsel stated that Moraski "ha[d] questions about its authenticity" that required further discovery. However,

Moraski argued both in her brief opposing Lewis's motion and at the motion hearing that the terms of the Second Agreement supported her position. Moreover, in her brief to this court, Moraski acknowledges that "the terms set forth [in the Second Agreement] are generally consistent with [her] understanding of the financed transaction." She also repeatedly invokes the Second Agreement in support of her contention that she became a shareholder on March 7, 2016. Given Lewis's reliance on the Second Agreement, and Moraski's statements about the Second Agreement and reliance upon it, we will assume that the Second Agreement sets forth the terms of an enforceable contract.

¶13    We also note that, as Lewis acknowledges, the Stock Redemption Agreement and the Second Agreement are not "models of draftsmanship," a circumstance that has complicated our task of interpreting them. To begin, the agreements share the same title—Stock Redemption Agreement—but neither memorializes a "redemption" of shares. In the securities context, "redemption" refers to "[t]he reacquisition of a security by the issuer." *Redemption*, BLACK'S LAW DICTIONARY (11th ed. 2019). In addition, the agreements are not a model of clarity with respect to the identity of the seller. The Stock Redemption Agreement uses the terms "subscribes" and "issued" and gives the Practice discretion to decide how Moraski would pay for the share, all of which suggest that Moraski purchased her share from the Practice. While the Second Agreement identifies Lewis as the "seller" and states that he "owns 2 shares of the [Practice]'s Common Stock" and wishes to sell one of those shares to Moraski, it also provides that he is the sole owner of the Practice, a service corporation, and importantly, Lewis affirms that he signed the Second Agreement on behalf of the Practice as its President.

¶14     According to Lewis, the Second Agreement and the Stock Redemption Agreement were intended to be part of the same transaction.  Moraski echoes this understanding in her appellate brief, describing the Second Agreement as setting forth "the terms upon which Moraski was to pay Lewis for the share over time."

¶15     Both parties agree that Moraski was to purchase only one share of the Practice from the Practice, not from Lewis personally.  In addition, the Second Agreement and the Stock Redemption Agreement were signed on the same day and relate to the same subject.  Accordingly, we will construe the agreements together and attempt to harmonize their terms as best we are able "since [the agreements] are, in the eyes of the law, one contract[.]"  *James Talcott, Inc. v. P&J Contracting Co.*, 27 Wis. 2d 68, 76, 133 N.W.2d 473 (1965) (citation omitted).

¶16     The parties focus significant attention on the second and third sentences of the Stock Redemption Agreement, which address when the share Moraski agreed to purchase was to be issued.  Moraski argues that the circuit court erred in determining that she was not a shareholder because the third sentence of the agreement specifies that the share she purchased "will be issued at closing on March 7, 2016."  Lewis argues that the second sentence of the agreement supports the circuit court's determination, contending that the provision that Moraski's share would be issued to her "upon such payment" refers to the first sentence setting forth the $125,000 purchase price.

¶17     Considered in isolation, and focusing only on the amount of the purchase price, these two sentences could be read to create ambiguity as to whether Moraski is a shareholder.  However, when considered in the context of

the entire Stock Redemption Agreement and the related Second Agreement, we conclude that the parties' intent as expressed in the contractual language was for Moraski to become a shareholder on March 7, 2016.

¶18    We begin with the first sentence of the Stock Redemption Agreement, which states in part that Moraski "agrees to pay $125,000 for each share subscribed for by her in cash, services or property as required by the Board of Directors of the [Practice]." The words "as required by the Board of Directors of the [Practice]" empower the board—which consisted solely of Lewis—to specify how Moraski would pay for her share.

¶19    We construe the Second Agreement, which Lewis prepared after Moraski asked for "more time to pay for the share she wished to purchase[,]" to set forth the payment terms. Of import here, the Second Agreement establishes two key points. First, Lewis chose cash as the method of payment. The Second Agreement makes no mention of payment in services or property; instead, it sets forth terms under which Moraski would pay the full purchase price in cash. Second, the Second Agreement specifies that only partial payment of the purchase price was due at closing. Specifically, the Second Agreement provides that "at the Closing"—which is identified later in the agreement as March 7, 2016—"Seller shall sell and [Moraski] shall purchase 1 share [of] Stock for $125,000." The Second Agreement then states that Moraski is to pay $50,000 of the purchase price "via check at Closing." The agreement states further that the "remaining $75,000" of the purchase price "will be loaned to [Moraski]" and sets forth, in three bulleted paragraphs, terms for repayment of that loan.

¶20    When read together, the Stock Redemption Agreement and the Second Agreement support Moraski's position that she became a shareholder on

March 7, 2016.  First, the Stock Redemption Agreement specifically states that the share Moraski agreed to purchase "will be issued at closing on March 7, 2016." This language is unconditional and, insofar as it identifies a specific date on which the share is to be issued, prevails over the more indefinite language upon which Lewis relies.  *See Goldmann Trust v. Goldmann*, 26 Wis. 2d 141, 148, 131 N.W.2d 902 (1965) ("Another important rule employed in construing agreements is that where there is an apparent conflict between a general and a specific provision, the latter controls.").  Second, the Second Agreement states that the buying and selling of the share was to occur on March 7, notwithstanding the fact that Moraski was only required to pay a portion of the purchase price on that date.  Third, the Second Agreement refers to March 7 as the "closing" date.  In the context of a business transaction, "closing" commonly refers to the final meeting of buyer and seller at which "the conveyancing documents are concluded and the money and property transferred."  *See Closing*, BLACK'S LAW DICTIONARY (11th ed. 2019; *McNamee v. APS Ins. Agency, Inc.*, 112 Wis. 2d 329, 333, 332 N.W.2d 828 (Ct. App. 1983) ("This court may resort to the use of a recognized dictionary to ascertain the meaning of contract terms.").  These aspects of the agreements lead us to conclude that the parties intended the Practice to issue the share and transfer it to Moraski on the closing date.

¶21    As noted above, Lewis relies on language in the Stock Redemption Agreement which specifies that the share is to be issued "upon such payment," which he contends refers to full $125,000 purchase price set forth in the first sentence of that agreement.  He argues further that the way to harmonize the two agreements is as follows:  failure to pay the full purchase price at closing is a breach of the Stock Redemption Agreement "forfeiting any right to purchase the share[,]" but the Second Agreement "avoids a breach by giving Dr. Moraski

additional time for payment" and, so long as Moraski makes the $50,000 payment at closing, commits "the Seller to the ultimate sale." We do not agree with Lewis's interpretation of the agreements.

¶22    Lewis's interpretation fails to take into account other language in each of the agreements. In the Stock Redemption Agreement, Moraski agreed to pay $125,000 for her share "in cash, services or property as required by the Board of Directors of the [Practice.]" The Second Agreement reflects what the board "required" in terms of payment—$50,000 at closing plus an obligation to pay the remaining $75,000 over time. Lewis's reading of the phrase "upon such payment" as referring simply to full payment of the $125,000 purchase price at closing ignores the payment obligation set forth in the Second Agreement. The phrase "upon such payment" does not simply refer to the total purchase price, but rather the manner in which the board directed it to be paid—a portion at closing and an obligation to pay the rest later. Lewis's reading improperly requires adding terms to the agreement, specifically inserting the word "full" before the word "payment."

¶23    In short, Lewis's interpretation cannot be reconciled with other language in the agreements. As we have discussed above, both the Stock Redemption Agreement and the Second Agreement contain language reflecting the parties' understanding that the transfer of the share to Moraski would occur on the closing date. Lewis's conception of an "ultimate sale" occurring at some point in the future is at odds with this language. It is apparent that the parties understood that Moraski would not pay the full purchase price at closing. Construing the Stock Redemption Agreement to impose a condition—full payment at closing—that neither of the parties expected to occur would undermine, rather than give effect to, the parties' intent. Indeed, it defies common

sense to conclude that the parties drafted an agreement that was breached on the date it was signed.

¶24     Additionally, even if Lewis's interpretation of the Stock Redemption Agreement was a reasonable alternative to Moraski's, we would be obliged to construe the document against Lewis because he drafted it. *See Walters v. National Props., LLC*, 2005 WI 87, ¶¶13-14, 282 Wis. 2d 176, 699 N.W.2d 71 ("[T]his court has traditionally adhered to … a universally accepted legal maxim that any ambiguities in a document are to be construed unfavorably to the drafter."). Lewis drafted both the Stock Redemption Agreement and the Second Agreement. He could have omitted the sentence specifying that the share would be issued on March 7, 2016 and included language specifying that the share would be transferred to Moraski only upon payment of the full purchase price. We cannot relieve him of the consequences of his failure to do so by construing one phrase he did choose to include in a way that brings it into conflict with other language in the agreements.[5]

¶25     Finally, Lewis cites a statute in the Wisconsin business corporation law that allows a corporation to place shares it has issued in escrow when full payment of the purchase price is not immediately made:

> The corporation may place in escrow shares issued for a contract for future services or benefits or a promissory note, or make other arrangements to restrict the transfer of the shares, and may credit distributions in respect of the shares against their purchase price, until the services are performed, the benefits are received or the note is paid. If

---

[5] Because any ambiguity in the sentences of the Stock Redemption Agreement that address issuance of the share can be resolved by construing them in the context of that agreement and the Second Agreement, we need not consider the extrinsic evidence cited by the parties in support of their respective interpretations.

> the services are not performed, the benefits are not received or the note is not paid, the corporation may cancel, in whole or in part, the shares escrowed or restricted and the distributions credited.

WIS. STAT. § 180.0621(5). Lewis contends that this statute is "consistent" with his reading of the parties' contract. That may be true, but it does not carry the day for Lewis. The Stock Redemption Agreement and the Second Agreement do not refer to this statute or contain any language indicating that the Practice would hold the share issued to Moraski in escrow until the full purchase price was paid. To the contrary, the agreements provide that the transfer of the share to Moraski was to occur at closing. If the parties had intended that the share be withheld until full payment was received, or that the share was restricted and subject to cancellation, it was incumbent upon Lewis as the drafter to make sure the terms of the agreements reflected that arrangement.

## CONCLUSION

¶26 For the reasons explained above, we conclude that Moraski became a shareholder in the Practice on March 7, 2016. Accordingly, we reverse the circuit court's judgment and remand this case with directions to enter declaratory judgment in favor of Moraski and for further proceedings with respect to Moraski's claims for an accounting and inspection of corporate records and Lewis's counterclaim for breach of contract.

*By the Court.*—Judgment reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

14